In the Matter of LONG LAKE ENERGY CORPORATION, Respondent, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Appellant.

Third Department, June 29, 1989

APPEARANCES OF COUNSEL

*William J. Cowan (Lawrence G. Malone* of counsel), for appellant.

*Read & Laniado (Sam Laniado* of counsel), for respondent.

## OPINION OF THE COURT

CASEY, J.

At issue in this proceeding is respondent's adoption of an "interim policy" which reflects a substantial change in the implementation of the Federal and State statutes enacted to encourage alternative energy sources in order to reduce dependence on traditional fossil fuels. Pursuant to the Federal legislation—the Public Utility Regulatory Policies Act of 1978 (Pub L 95-617) (hereinafter PURPA)—electric utilities are

required to purchase electricity from qualifying cogeneration and small power production facilities (hereinafter qualifying facilities) in accordance with rules promulgated by the Federal Energy Regulatory Commission (hereinafter FERC) (16 USC § 824a-3 [a]). PURPA requires that the regulatory rates for purchases by electric utilities be just and reasonable to the utilities' consumers, in the public interest and not discriminatory against qualifying facilities, but that the purchase rate not exceed the purchasing utility's avoided cost (16 USC § 824a-3 [b]). A utility's avoided cost is the amount that it would have cost the utility to generate the same energy that it bought from the qualifying facility had that purchase not been made (*Matter of Consolidated Edison Co. v Public Serv. Commn.,* 63 NY2d 424, 431, n 2, *appeal dismissed* 470 US 1075). The regulatory purchase rate established by FERC is generally equal to the utility's avoided cost, although it may be lower *(supra)*.

In 1980, the State Legislature added section 66-c to the Public Service Law (L 1980, ch 553, § 7), declaring that "it is in the public interest to encourage the development of alternate energy production facilities, co-generation facilities and small hydro facilities[*] in order to conserve our finite and expensive energy resources and to provide for their most efficient utilization" (Public Service Law § 66-c [1]). Respondent was directed to encourage the participation of utilities in cogeneration, small hydro and alternate energy production facilities (hereinafter independent power producers), and to require utilities to enter into long-term contracts with independent power producers for the purchase of electricity "under such terms and conditions as [respondent] shall find just and economically reasonable to the [utility's] ratepayers, non-discriminatory to [independent power producers] and further the public policy set forth herein" (Public Service Law § 66-c [1]). Respondent was also directed to establish a minimum sales price of at least 6 cents per kilowatt hour (§ 66-c [1]). In a proceeding to challenge the validity of this State's attempt to enter a field already occupied by Federal legislation, the Court of Appeals held that "there is no direct conflict between PURPA's maximum purchase rate and the Public Service Law's higher minimum purchase rate" *(Matter of Consolidated Edison Co. v Public Serv. Commn.,* 63 NY2d 424, 435, supra).

---

* The reference to small hydro facilities was added in 1981 (L 1981, ch 843, § 9).

To implement the Federal and State legislation, respondent adopted a policy which required utilities to offer to purchase electricity from independent power producers at the greater of the State's 6-cent per kilowatt hour minimum or the FERC avoided cost maximum. Based upon its experience with this policy and upon statistics, projections and estimates prepared by its staff, respondent issued an order on September 28, 1987 adopting: "[an] interim policy on an emergency basis under Section 202 (6) of the State Administrative Procedure Act (SAPA) since immediate action is necessary for the preservation of the general welfare and compliance with the advance notice and comment requirements of Section 202 (1) of SAPA would be contrary to the public interest. The general welfare of the ratepayers of the State's investor-owned electric utilities will be promoted by adoption of our interim policy on contracts between electric utilities and independent power producers until we consider the issues presented in ongoing proceedings * * *. At the same time, our interim policy ensures that electric utilities will continue to negotiate contracts with independent power producers in furtherance of Section 66-c of the Public Service Law." A number of independent power producers submitted comments and/or petitions for rehearing and, on December 18, 1987, respondent issued an order finding: "no basis for modifying the interim policy. The comments and petitions for rehearing show no errors of law or fact in our decision. Additionally, it should be kept in mind that the interim policy is just that: a stop-gap measure pending adoption of a new permanent policy early in 1988. The interim policy has a rational basis and is necessary to limit potential overcharges to customers. It is neither unlawful nor unwise."

■ Petitioner, an independent power producer, commenced this proceeding seeking to annul the second of the three options for contracts between electric utilities and independent power producers contained in the interim policy. As explained in respondent's December 18, 1987 order, the second option permitted "long-term contracts at the current 6¢/kWh minimum rate, provided that rate is left in place for a period long enough so that payments at 6¢/kWh would equal our most recent estimates of long-run avoided costs for the utility, levelized over that period". It is anticipated that long-run avoided costs will gradually rise during the term of the contract. For the first few years of the contract, those costs are projected to be below the 6-cent per kilowatt hour mini-

mum imposed by Public Service Law § 66-c, resulting in payments in excess of the FERC maximum. Based upon respondent's concern that this payment in excess of the FERC maximum is not in the public interest, the second option requires that even after the long-run avoided costs rise about the 6-cent per kilowatt hour minimum, the payments will continue at the 6-cent rate until the payments at a rate below long-run avoided costs offset the earlier payments above the long-run avoided costs. Supreme Court concluded that, in effect, the second option of respondent's interim policy converted the statutory minimum rate into a maximum and was in violation of Public Service Law § 66-c. We disagree.

Supreme Court was of the view that respondent's adoption of the second option in its interim policy constituted an impermissible attempt to engage in the type of regulatory activity that had been proscribed by Public Service Law § 66-c. In *Matter of Occidental Chem. Corp. v Public Serv. Commn.* (114 AD2d 149, 153, *lv denied* 68 NY2d 608), this court said that, pursuant to Public Service Law § 66-c, respondent's "normal utility regulatory authority" with respect to independent power producers, including its "traditional role of setting just and reasonable rates for the purchase of power", had been "either erased or diminished to the point of being virtually ministerial". Thus, we held that respondent lacked the authority to construe the word "developed" in Public Service Law § 66-c (1) (a) in such a manner as to deprive independent power producers of the statutory 6-cent per kilowatt hour minimum if their facilities were "substantially designed and constructed" before the date specified in the statute *(supra,* at 154-156). We conclude that *Matter of Occidental Chem. Corp.* is distinguishable from the case at bar, and that although respondent's traditional role in setting just and reasonable rates for the purchase of power has been substantially diminished with respect to independent power producers, Public Service Law § 66-c prescribes specific boundaries within which respondent may continue to exercise its discretionary regulatory authority *(see, Matter of Long Is. Light. Co. v Public Serv. Commn.,* 137 AD2d 205, 210-211, *lv denied* 73 NY2d 703).

The statute directs respondent to require long-term contracts between utilities and independent power producers "under such terms and conditions as [respondent] shall find just and economically reasonable to the [utility's] ratepayers, non-discriminatory to [independent power producers] and further the public policy set forth herein; provided, however,

[respondent] shall establish a minimum sales price * * * of at least six cents per kilowatt hour * * * subject to periodic revision by [respondent] to reflect increases in the cost of utility generated electricity" (Public Service Law § 66-c [1] [a]). Since the option under review clearly requires a long-term contract with a sales price of no less than 6 cents per kilowatt hour, there has been no violation of the specific requirements of the statute. We disagree with Supreme Court that the disputed option has converted the statutory minimum into a maximum, for the option permits the purchase price to rise above the minimum once the "levelization" process is complete.

Turning to the more difficult question of whether the option violates the purpose of Public Service Law § 66-c, petitioner argues that the statute was intended to create an incentive for independent power producers over and above that created by PURPA and that the rights conferred by the statutes are cumulative, so that at any point in time petitioner is entitled to the incentive under the statute that will provide the greatest benefit. Thus, according to petitioner, the purchase price must be 6 cents per kilowatt hour until such time as a utility's avoided costs exceed that rate, at which time the purchase price shall be at the avoided cost rate. Respondent, on the other hand, contends that the Federal and State statutes create separate and distinct programs which respondent can implement through any method that is consistent with the requirements of those programs. Thus, according to respondent, the option at issue is valid since it provides for a long-term contract with a minimum price of 6 cents per kilowatt hour as required by Public Service Law § 66-c, and it is consistent with the Federal program since FERC recognizes the use of contracts which provide for payments at above long-run avoided costs during the early years of the contract, with corresponding payments at below long-run avoided costs during the later years of the contract (see, preamble to FERC Rules, 45 Fed Reg 12214, 12224 [1980]).

■ We agree with respondent. The purpose of Public Service Law § 66-c is to encourage the development of alternate energy production and it furthers the objective: "by enhancing the bargaining position of the alternate energy developer through a predictable, guaranteed rate of 6 cents per kilowatt hour. The Federal avoided-cost standard requires complicated calculations and may fluctuate greatly * * *. The stability provided by the Public Service Law to the alternate energy

producers reduces the perceived risk of a project, encourages investment, and facilitates financing" *(Matter of Consolidated Edison Co. v Public Serv. Commn., 63 NY2d 424, 437, supra)*. Thus, contrary to petitioner's argument, the statute does not seek to encourage the production of alternate energy by providing that the producers will always receive the greater of the State's 6-cent per kilowatt hour minimum or the Federal avoided cost maximum. Rather, the State's guaranteed minimum is intended to introduce a degree of stability and predictability not available under the Federal statute. Had the Legislature intended to create the incentive urged by petitioner, it would not have provided respondent with the authority and duty to prescribe contractual terms and conditions based in part on respondent's findings as to what is "just and economically reasonable" to the utility's ratepayers (Public Service Law § 66-c [1] [a]). We cannot agree with either petitioner or Supreme Court that the statute mandates the payment of the greater of the State minimum or the Federal maximum irrespective of whether such a payment is just and economically reasonable to the utility's ratepayers, in the public interest or furthers the policy of Public Service Law § 66-c.

■ Next, we reject petitioner's contention that respondent's adoption of the interim policy was arbitrary and capricious. Although the option at issue here represents a marked change from the precedent established by respondent's prior determinations, respondent's orders contain a reasoned explanation for altering its prior policy *(see, Matter of Niagara Mohawk Power Corp. v Public Serv. Commn., 138 AD2d 63, 68, lv denied 73 NY2d 702; cf., Matter of Field Delivery Serv. [Roberts], 66 NY2d 516, 519-520)*. We also find that respondent had a rational basis for adopting the interim policy as a temporary "stop-gap measure" pending adoption of a new permanent policy.

Respondent adopted its interim policy pursuant to the "[n]otice of emergency adoption" provisions of State Administrative Procedure Act § 202 (6). The record does not indicate whether respondent has readopted the emergency measure in accordance with the requirement of State Administrative Procedure Act § 202 (6) (e), and the parties have not addressed the issue. Accordingly, there is no basis for judicial intervention at this point, but we note that more than 1½ years have passed since the "emergency measure" was adopted and more

than one year has elapsed since respondent's target date for the adoption of a new permanent policy.

MAHONEY, P. J., WEISS, MERCURE and HARVEY, JJ., concur.

Judgment reversed, on the law, without costs, determination confirmed and petition dismissed.