In the Matter of INDECK-YERKES ENERGY SERVICES, INC., Respondent, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK et al., Appellants.

Third Department, January 24, 1991

*William J. Cowan (James W. Brew* of counsel), for Public Service Commission of the State of New York, appellant.

*Le Boeuf, Lamb, Leiby & MacRae (Cathleen A. McNulty, Jeffrey W. Meyers* and *H. Peter Young* of counsel), for Niagara Mohawk Power Corporation, appellant.

*Saperston & Day, P. C. (Daniel M. Darragh* of counsel), for respondent.

## OPINION OF THE COURT

LEVINE, J.

Petitioner owns and operates a cogeneration facility (hereinafter the facility) in the Town of Tonawanda, Erie County, that is qualified under the Federal Public Utility Regulatory Policies Act (16 USC § 824a-3) (hereinafter PURPA) and Public Service Law § 66-c for the mandatory purchase of its electric energy production by public utilities. PURPA provides that such purchases shall be paid for at rates that are, *inter alia,* "just and reasonable to the electric consumers of the electric utility" (16 USC § 824a-3 [b] [1]), but may not exceed the purchasing utility's avoided cost, i.e., the cost the utility avoids paying by not producing the energy itself *(see,* 16 USC § 824a-3 [d]; *Matter of Consolidated Edison Co. v Public Serv. Commn.,* 63 NY2d 424, 431, *appeal dismissed* 470 US 1075). Under Public Service Law § 66-c, respondent Public Service Commission (hereinafter the PSC) is directed to fix the terms and conditions of such purchases it finds are "just and economically reasonable to the [utility's] ratepayers, non-discriminatory * * * and further the public policy" of encouraging the development of alternate energy production facilities, etc., with the added requirement of a minimum purchase price of 6 cents per kilowatt hour (Public Service Law § 66-c [1]). Thus, the PSC performs the regulatory role under the statutory framework of approving the terms and conditions of energy purchase agreements between public utilities and qualifying alternate energy production facilities, cogeneration facilities and small hydro-facilities *(see, Matter of Long Lake Energy*

*Corp. v Public Serv. Commn.,* 148 AD2d 84, 88, *lv denied* 75 NY2d 701), and none of the parties to these appeals dispute this.

In February 1987, petitioner entered into a 30-year contract with respondent Niagara Mohawk Power Corporation (hereinafter NiMo) for the purchase of electric production from petitioner's facility. The agreement recited that petitioner was to operate a plant with an "initial capacity of approximately 49 megawatts, and with expected annual production of approximately 400,000 megawatt-hours initially, (individually and together referred to as 'ELECTRICITY')". The agreement obligated NiMo to purchase "all of the ELECTRICITY" produced at petitioner's facility.

The contract between NiMo and petitioner contained a "cone-like" pricing structure that included a floor and a ceiling, as has been particularly described in *Matter of Long Is. Light. Co. v Public Serv. Commn.* (137 AD2d 205, 209, *lv denied* 73 NY2d 703). The pricing structure in the agreement was "front-loaded" for the first 15 years of its term, i.e., the payments were likely to exceed estimated avoided costs. In that sense, during the first half of the life of the contract, NiMo's ratepayers would be subsidizing the construction and operation of petitioner's facility, since NiMo's cost of buying energy from petitioner was passed on in its rates to customers, and that cost exceeded what NiMo's expenses would have been in otherwise producing the same energy *(see, Matter of Long Lake Energy Corp. v Public Serv. Commn., supra,* at 90; *Matter of Long Is. Light. Co. v Public Serv. Commn., supra,* at 209).

The agreement was submitted to the PSC staff, which issued a report qualifiedly recommending approval. The PSC approved the agreement at its meeting of June 10, 1987. In April 1988, petitioner informed NiMo that "due to improvement in cycle efficiency and overall system availability", the anticipated output of its facility would be 53.38 megawatts (hereinafter MW) rather than 49 MW and that it considered NiMo bound to purchase the increased amount pursuant to the pricing terms of the agreement. When NiMo disagreed, petitioner applied to the PSC for a declaratory ruling as to whether NiMo was required to accept the additional output priced according to the pricing structure of the agreement.

The PSC issued its declaratory ruling effective September 14, 1988 in which it determined that (1) representations of the

size of the facility were "a significant factor in evaluating the reasonableness" of the contract submitted to it for approval, (2) the increase of 4.38 MW, some 9% of the original total estimated output, was a material deviation from the estimate in the approved agreement, (3) the use of the word "approximately" in conjunction with the capacity of 49 MW only referred to "an inescapable imprecision with respect to the expected output of a planned facility", and not to an increase which is attributable, as here, to changes in the facility's operations "to improve cycle efficiency and availability", and (4) petitioner failed to expressly reserve the increased capacity in the agreement. Therefore, the PSC ruled that its approval of the terms of the agreement did not cover the increased capacity, and the sale of the additional output to NiMo required renegotiation and pricing in conformity with the PSC's more recently adopted "Interim Policy", which was less favorable to facility developers (see, Matter of Long Lake Energy Corp. v Public Serv. Commn., supra). Petitioner's application for a rehearing was denied, with the PSC reiterating that the specified capacity of approximately 49 MW was a "material consideration" in the PSC's approval of the agreement and of its "unusual pricing provisions".

Petitioner then brought the instant CPLR article 78 proceeding for judicial review of the PSC's declaratory ruling. Supreme Court annulled. The court interpreted the contract as essentially requiring NiMo to accept and pay for the entire output of petitioner's facility. It also found, based notably upon other terms of the agreement and portions of the PSC's staff report, that NiMo and the PSC were aware of the possibility that petitioner's facility would be expanded well beyond the estimated initial capacity of 49 MW. Therefore, the court held that the PSC acted arbitrarily in refusing to include the increase within NiMo's obligations under the agreement. The PSC and NiMo appeal from Supreme Court's annulment of the declaratory ruling.

We reverse. The issue in this proceeding is not one of pure interpretation of the language of the agreement between petitioner and NiMo by application of common-law principles of contract. Rather, it is whether there was a rational basis to the PSC's determination of the scope of its prior approval of the parties' agreement, particularly the price structure contained therein, as not covering other than insignificant deviations from the contract's stated initial output of approximately 49 MW (see, Matter of New York State Cable Tel. Assn.

*v New York State Pub. Serv. Commn.,* 125 AD2d 3, 6). More-over, we disagree with Supreme Court as to the significance of any understanding by NiMo and the PSC that petitioner's facility might expand its output substantially beyond the initial capacity set forth in the agreement. As the PSC recog-nized in its declaratory ruling, petitioner, the operator of a qualified facility under PURPA and Public Service Law § 66-c, could expect that NiMo would be required to purchase the output of any expanded capacity at the facility. However, this is not determinative of whether the purchase of any addi-tional output should be governed by the pricing structure set forth in the agreement.

In our view, the reasonableness of the PSC's determination is amply demonstrated by the record. First, as the PSC pointed out, petitioner did not expressly reserve the right to expand output under the terms and conditions of the agree-ment and, indeed, a clause to that effect was struck from the agreement by the parties before its submission for PSC ap-proval. In contrast, express terms for expanding capacity were included in other NiMo contracts with similar facilities sub-mitted to the PSC. Moreover, under the express language of the agreement, NiMo obligated itself to accept the facility's output of "ELECTRICITY" subject to the terms and conditions in the agreement. "ELECTRICITY", however, was defined under the agreement as an initial capacity of about 49 MW and annual production of 400,000 MW-hours. Thus, the terms of the agreement would not have necessarily alerted the PSC to the existence, if any, of an agreement between the parties that substantially expanded output would be purchased in accor-dance with the terms of the agreement's cone-pricing struc-ture.

Most importantly, both the PSC's staff report and the min-utes of the PSC's June 10, 1987 meeting at which the agree-ment was approved (both of which petitioner attached to its petition) reflect a concern over the pricing structure of the agreement as perhaps being unduly favorable to petitioner and burdensome to ratepayers. The misgivings of the PSC's staff were only allayed after the staff quantified the potential benefits and burdens by estimates of specific dollar amounts under the terms of the agreement. Petitioner has not con-tested the PSC's assertion that these staff estimates were *necessarily* based upon the represented 49 MW capacity of petitioner's facility. Thus, the PSC was entirely accurate in stating in the declaratory ruling and its denial of the applica-

tion for a rehearing that the represented 49 MW size of petitioner's facility was both a "significant factor" and a "material consideration" in the PSC's approval of the agreement, particularly its pricing provisions. It follows from the foregoing that the PSC's determination of the scope of its prior approval of the agreement between petitioner and NiMo was neither irrational nor arbitrary and unfair to petitioner and, therefore, it must be confirmed *(see, Matter of Long Lake Energy Corp. v Public Serv. Commn.,* 148 AD2d 84, *supra; Matter of New York State Cable Tel. Assn. v New York State Pub. Serv. Commn.,* 125 AD2d 3, *supra).* This conclusion renders academic the appeal from Supreme Court's order adhering to its original decision upon reargument.

MAHONEY, P. J., WEISS, MERCURE and HARVEY, JJ., concur.

Judgment reversed, on the law, without costs, determination confirmed and petition dismissed.

Appeal from order dismissed, as academic, without costs.