■ ENERGY TACTICS, INC., Appellant, v NIAGARA MOHAWK POWER CORPORATION, Respondent. [631 NYS2d 697] —In an action, *inter alia,* to recover damages for breach of contract, the plaintiff appeals from so much of an order of the Supreme Court, Suffolk County (Lama, J.), entered January 13, 1994, as granted the defendant's application for summary judgment and denied the plaintiff's cross motion for partial summary judgment directing the defendant to specifically perform the contract.

Ordered that the order is reversed insofar as appealed from, on the law, with costs, the defendant's application for summary judgment is denied, and the plaintiff's cross motion for partial summary judgment directing the defendant to specifically perform the contract is granted.

The plaintiff, Energy Tactics, Inc. (hereinafter Energy Tactics), a qualified "alternative energy producer" under the

relevant Federal laws, entered into a 20-year output contract with the defendant, Niagara Mohawk Power Corporation (hereinafter Niagara Mohawk), for the sale of electricity. In 1992, after five years of purchasing all of the electricity generated by Energy Tactics pursuant to the terms of the contract, Niagara Mohawk claimed for the first time that Energy Tactics' output was exceeding the maximum limits set by the contract. Pursuant to this claim, Niagara Mohawk notified Energy Tactics that it would no longer purchase electricity at the contractual rate of 6¢ per megawatt-hour for any output in excess of 10% above the approximate yearly output figure stated in the contract to be the plant's initial output, which, by Niagara Mohawk's calculations, was any output in excess of 6,600 megawatt-hours (6,000 plus 10% of 6,000). For such alleged excess amounts of electricity, Niagara Mohawk instituted a complex formula for payment and arrived at a figure of $3^1/_2$¢ per unit of the excess. The Supreme Court agreed with Niagara Mohawk's construction of the contract and granted it summary judgment. We now reverse and grant partial summary judgment to Energy Tactics.

Pursuant to the terms of the contract: "SELLER [Energy Tactics] shall deliver to NIAGARA and NIAGARA shall accept all of the ELECTRICITY produced at the PLANT subject to the terms and conditions of this agreement." The only limitation concerning output contained in the contract is as follows: "SELLER will lease or own and operate an electric generating 'plant * * * with an *initial* capacity of approximately 1.0 megawatts, and with expected annual production of approximately 6,000 megawatt-hours, initially" (emphasis added).

The qualifying terms "initial" and "initially" were placed in the contract to reflect the parties' understanding that two generators would be operated at the plant but that one would not be on line and fully operational until part way through the first year. Thus, the production approximations stated in the contract concern the first year of production only and reflect a figure significantly less than full operating capacity. Consequently, the contract is silent as to the plant's expected output for the remaining 19 years of the contract, save for the megawatt capacity of 1.0 when both generators are operational. However, the parties agree that the 1.0 megawatt capacity of both generators exceeds 9,000 megawatts per year, although the contract language is silent on this subject.

Contracts concerning output are subject to good faith and commercial standards of fair dealing (*see,* UCC 2-306; *Feld v Levy & Sons,* 37 NY2d 466), especially where, as here, the

defendant's obligation to purchase is imposed by law *(see,* Public Service Law § 66-c; Federal Public Utility Regulatory Policies Act, 16 USC § 824a-3; *Philadelphia Corp. v Niagara Mohawk Power Corp.,* 207 AD2d 176). When an output contract is silent as to output approximations or figures, the parties' respective obligations are limited to normal or otherwise comparable prior output or requirements and no quantities unreasonably disproportionate to such amounts may be tendered or demanded *(see, Feld v Levy & Sons, supra; Philadelphia Corp. v Niagara Mohawk Power Corp., supra,* at 179; *Fulton Cogeneration Assocs. v Niagara Mohawk Power Corp.,* 1995 WL 319935. [US Dist Ct, ND NY, Mar. 28, 1995, Scullin, J., 92 Civ 1412]; UCC 2-306; 93 NY Jur 2d, Sales, § 45). Here, for the years 1988 through 1992, Energy Tactics generated and Niagara Mohawk purchased 6,326.25; 8,059.50; 8,234.30; 9,458.40; and 8,728.30 megawatt-hours of electricity, respectively. Thus, discounting the atypical first year of production, the plant's average yearly output of electricity was approximately 8,620 megawatt-hours. Even including the atypical first year of production, the plant's yearly output still averaged over 8,000 megawatt-hours. It is this norm against which the parties' respective obligations under the contract must be measured. We conclude, therefore, that the contract obligates Niagara Mohawk to purchase at the contractual rate all electricity produced by Energy Tactics that is normal and comparable with such past production rates.

Further, Energy Tactics proffered unrebutted sworn allegations that Niagara Mohawk, at the time that it entered into the contract, was aware that the capacity of the plant, once fully operational, would be at least 1.0 megawatts and that its yearly output would exceed 9,000 megawatt-hours. Accordingly, Energy Tactics's yearly production of electricity was in good faith and commercially reasonable. Rosenblatt, J. P., Ritter, Copertino and Santucci, JJ., concur.