**FULTON COGENERATION ASSOCIATES, Plaintiff–Appellee,**

v.

**NIAGARA MOHAWK POWER CORP., Defendant–Appellant.**

**No. 700, Docket 95–7540.**

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 1996.

Decided May 15, 1996.

Robert A. Barrer, Syracuse, NY (Hiscock & Barclay, LLP; Brian K. Billinson, Niagara Mohawk Power Corporation, of counsel), for Defendant–Appellant.

Leonard H. Singer, Albany, NY (Couch, White, Brenner, Howard & Feigenbaum, of counsel), for Plaintiff–Appellee.

Before OAKES, KEARSE and WINTER, Circuit Judges.

OAKES, Senior Circuit Judge:

Niagara Mohawk Power Corporation ("Niagara") appeals from a summary judgment entered by the United States District Court for the Northern District of New York, Frederick J. Scullin, Jr., *Judge*, in favor of Fulton Cogeneration Associates ("Fulton") on its claim against Niagara for breach of contract. The district court held that Niagara was obligated under the contract to purchase all electricity generated by an electric generating facility operated by Fulton in the Town of Fulton, New York, so long as such quantities were not unreasonably disproportionate to the stated estimates within the contract, and that, as a matter of law, Fulton never produced an amount of electricity that exceeded commercially reasonable expectations. Niagara argues on appeal that the district court should have dismissed or stayed the action until the New York Public Service Commission ("PSC") ruled on the matter, that the district court erred in granting Fulton summary judgment because several genuine issues of material fact exist, and that the district court erred in not granting summary judgment to Niagara because Niagara acted properly under the Agreement and PSC rules. We find that this case presents material issues that must be determined by a trier of fact, and we therefore reverse and vacate in part the summary judgment in favor of Fulton and remand. In all other respects, we affirm the district court.

## BACKGROUND

In 1978, Congress passed the Public Utility Regulatory Policies Act ("PURPA"), 16 U.S.C. § 824, *et seq.*, in an effort to reduce United States dependence on foreign oil by encouraging the development of alternative energy sources. To further this goal, PURPA requires electric utilities to purchase all electricity produced by independent power producers operating so-called Qualifying Facilities ("QF"). *See* 16 U.S.C. § 824a–3(b); 18 C.F.R. § 292.304. State agencies such as the PSC are empowered to regulate the facilities and approve the contracts covered by PURPA. *See* 16 U.S.C. § 824a–3; N.Y.Pub. Serv.Law § 66–c(1) (McKinney Sup.1995).

In December 1987, Turner Power Group, Inc., Fulton's predecessor-in-interest and an independent power producer operating a QF (the "Plant"), entered into a power purchasing agreement (the "Agreement") with Niagara pursuant to the provisions of PURPA. The first "WHEREAS" clause of the Agreement describes the size of Fulton's Plant:

> SELLER will own and operate an electric generating plant ... with a capacity of approximately 47.0 megawatts, and with expected annual production of approximately 392,000 Megawatt-hours (individually and together referred to as "ELECTRICITY")
>
> . . . .

Under the terms of the Agreement, Fulton agreed to deliver and Niagara agreed to accept all of the "electricity" produced by the Plant, net of any amounts used by Fulton itself.[1] The Agreement further provides that Niagara must pay for the electricity "on the basis of energy, or kwh, delivered" to Niagara at the rate established in Niagara's tariff,

---

1. The Agreement states: "SELLER shall deliver to NIAGARA and NIAGARA shall accept all of the ELECTRICITY produced at the PLANT net of parasitic loads subject to the terms and conditions of this AGREEMENT." The term "parasitic load[]" refers to the electricity used by the Fulton Plant.

which is 6¢/Kwh. The PSC approved the contract in April 1988.

The Plant is designed to deliver electricity to Niagara and steam to a Nestle Chocolate & Confections Company factory located nearby. The Plant's gas turbine generator set burns natural gas or #2 distillate oil to produce electricity. Exhaust heat from the turbine is captured and used to generate steam, some of which can be injected back into the turbine to boost capacity levels, and therefore ultimate energy production, after Fulton has sent the required amount of steam to the Nestle factory.

The distinction between capacity and energy is crucial to an understanding of the dispute between these two parties. As explained in affidavits submitted by both parties, the term "capacity" refers to the amount of electric power that an electric generator can produce, and is measured in kilowatts (Kw) or megawatts (Mw). The term "energy" is the usage of capacity over a period of time and is measured in kilowatthours (Kwh) or megawatthours (Mwh). Thus, the two concepts are linked and dependent upon one another. As the contract states, the terms are referred to individually and collectively as "ELECTRICITY."

Upon completion of the Plant in July 1991, Fulton began delivering electricity to Niagara. From July 1991 through April 1992, Niagara bought all delivered electricity from Fulton at the rate of 6¢/Kwh.

On March 13, 1992, Niagara informed Fulton that the Plant was producing above a 47 megawatt capacity.[2] Because Niagara believed it was not required to pay for production above that level, it stated that it would use a formula called "Demonstrated Maximum Net Capability," or "DMNC," to measure the seasonal capacity of the Plant and prorate payments to Fulton. Under this formula, if the capacity climbed over the 47 megawatts provided in the contract, Niagara would calculate a seasonal capacity rate based upon the four peak hour capacity output in the summer and winter—in other words, the highest average consecutive four-hour output—and would pay the 6¢/Kwh rate only for that proportion of electricity attributable to a 47 megawatt capacity. Any excess would be paid at a market rate, which was lower than the 6¢/Kwh contract rate. The DMNC formula was mentioned nowhere within the Agreement between Niagara and Fulton, but Niagara chose it because it had been utilized by the PSC in connection with other PURPA contracts.

Niagara thus measured the seasonal capacity of the Plant in terms of the DMNC formula at 50 megawatts. Niagara thereafter paid for 47/50ths of the energy at the 6¢/Kwh rate and the rest at a market rate. Niagara used this DMNC formula from May 1992 through October 1992. After October 1992, it began paying the 6¢/Kwh rate again. The use of the formula resulted in Niagara paying Fulton $279,691.19 less in 1992 than it would have been obligated to do at the contract rate.[3]

Fulton commenced this breach of contract action based upon diversity of citizenship on October 30, 1992, seeking both equitable and monetary relief. After denying Niagara's motion to dismiss the complaint due to the doctrines of abstention and primary jurisdiction, the district court ordered that discovery proceed. After the close of discovery, both parties moved for summary judgment. In an order dated October 11, 1994, the district court denied both parties' motions.[4] The

---

2. Niagara installed meters at the Fulton plant to measure capacity and energy. According to an affidavit submitted by Fulton, a 47 MW gas turbine plant, if operated continuously 24 hours a day, 365 days per year, would generate 411,720,000 Kwh per year, but because of downtime amounting to about 8 days per year for necessary maintenance, and forced outages calculated to sacrifice 3% of the total production, the plant was estimated to produce approximately 390,600,000 Kwh annually.

3. Niagara later conceded that Fulton was entitled to $152,264.47 of this amount because of a July 24, 1992, amendment to Section 66-c of the New York Public Service Law which applies to payments under PURPA contracts. There remains, therefore, $127,426.72 plus interest in dispute between the parties.

4. The district court also denied Fulton's motion for sanctions based upon Niagara's belated concession that it owed Fulton $152,264.47 of the contested amount.

case was scheduled for a final pre-trial conference and a bench trial to commence on March 27, 1995. On the morning of the first day of trial, the district court decided to reconsider the summary judgment motions *sua sponte,* based in large part upon a recently decided case of the Appellate Division, Third Department, *Philadelphia Corp. v. Niagara Mohawk Power Corp.,* 207 A.D.2d 176, 621 N.Y.S.2d 237 (3d Dept.1995). After hearing oral argument, the district court granted summary judgment to Fulton.

Niagara's motion for reconsideration was subsequently denied, and this appeal ensued.

## DISCUSSION

Niagara raises three issues in its appeal. First, it claims that the district court should have declined jurisdiction in this case based upon the doctrine of abstention or, alternatively, the doctrine of primary jurisdiction. Second, Niagara asserts that the district court erred in granting summary judgment to Fulton because material issues of fact regarding the alleged breach of contract remain in dispute. Finally, Niagara argues that the district court should have entered summary judgment in favor of Niagara because Niagara acted properly under the terms of the Agreement and PSC rules. We will address each of these issues in turn.

## I. Exercise of Jurisdiction

Niagara moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Fulton's complaint on the basis of the doctrine of abstention, or, in the alternative, the doctrine of primary jurisdiction. The district court denied Niagara's motion, finding that no state policy problems of substantial importance were involved and that this breach of contract action did not fall within the particular expertise and regulatory duties of the PSC. We agree with the district court and therefore affirm its denial of Niagara's motion to dismiss.

### A. Doctrine of Abstention

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *In re Joint Eastern and Southern District Asbestos Litigation,* 78 F.3d 764, 775 (2d Cir.1996) (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976)). A district court's decision to abstain is appropriate only in order:

(1) to avoid a federal constitutional issue where that issue may be mooted or altered by a state-court ruling on the state-law question; or (2) to avoid hindrance of such state functions as criminal prosecutions or the collection of state taxes; or (3) to conserve federal judicial resources in those "exceptional circumstances" where there is concurrent state-court litigation whose resolution could result in "comprehensive disposition of litigation"; or (4) to defer to state resolution of difficult state-law questions that involve local regulation and administration or important matters of local public policy.

*Id.* (citations omitted). A district court abuses its discretion if it abstains from jurisdiction in a case that is not covered by one of these four narrow exceptions. *Id.* at 775–76.

Niagara argues that the fourth category listed above applies to this case: that a district court may decline to adjudicate difficult questions of state law bearing on substantial public policy matters whose import extends beyond the particular case. This exception to a district court's duty to exercise jurisdiction is commonly referred to as *Burford* abstention, after *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), where the Supreme Court decided that abstention from jurisdiction was proper in a case in equity involving review of a Texas Railroad Commission order regarding the conservation of oil and gas. In *New Orleans Public Service, Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 2514–15, 105 L.Ed.2d 298 (1989), the Supreme Court summarized the principles underlying *Burford* abstention:

Where timely and adequate state-court review is available, a federal court . . . must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substan-

tial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." (quoting *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1245).

We agree with the district court that application of *Burford* abstention would be inappropriate in this case. There are no difficult questions of state law affecting policy issues of substantial import here; the case simply involves a breach of contract. Though the PSC approved the contract, it has not attempted to interpret the contract or monitor the parties' performance since its initial involvement. Therefore, there is no indication that New York considers the issues presented by this dispute to be ones of substantial import. Neither does exercise of jurisdiction in this case threaten to disrupt a coherent policy of New York, because although there is a state regulatory scheme regarding contract approval in cases such as this, there is no state regulatory scheme governing contract interpretation or performance. Accordingly, the district court properly refused to apply *Burford* abstention.

## B. Primary Jurisdiction Doctrine

As an alternative to Niagara's argument regarding *Burford* abstention, it claims that the district court should have applied the primary jurisdiction doctrine and withheld its exercise of jurisdiction until an application was made to the PSC seeking a clarification of the Agreement.

The primary jurisdiction doctrine applies "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956); *see also Johnson v. Nyack Hosp.,* 964 F.2d 116, 122–23 (2d Cir. 1992) (finding the doctrine applicable to cases involving state agencies). The aim of the doctrine, then, is to ensure that courts and agencies with concurrent jurisdiction over a

matter do not work at cross-purposes. *See General Elec. Co. v. M.V. Nedlloyd,* 817 F.2d 1022, 1026 (2d Cir.1987) (citing 3 K. Davis, *Administrative Law,* § 19.01 at 5 (1958)), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988). In deciding whether to apply the primary jurisdiction doctrine to a given case, a court must take into account the need for uniform decisions and the specialized knowledge of the agency involved. *Western Pac. R.R.,* 352 U.S. at 64, 77 S.Ct. at 165; *see also Goya Foods, Inc. v. Tropicana Products, Inc.,* 846 F.2d 848, 851 (2d Cir. 1988). As a threshold matter, of course, a court must find that the agency has jurisdiction over the issue presented. *Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 59 (2d Cir.1994).

We agree with the district court that the primary jurisdiction doctrine cannot be properly applied to this case. The PSC's explicit jurisdiction is limited by New York Public Service Law § 66–c (McKinney Sup. 1995), which speaks only of the PSC's power to require utilities to enter into power purchasing agreements with alternative energy producers. The PSC has been reluctant to extend this express jurisdiction over the formation of contracts to adjudication of breach of contract disputes. *See Northeast Cogen., Inc.,* NYPSC Case No. 90–E–0975, Declaratory Ruling at 5 (Apr. 8, 1991); *Kamine/Besicorp Allegany L.P. v. Rochester Gas & Electric Corp.,* 908 F.Supp. 1180, 1186 (W.D.N.Y.1995). Even if the PSC could exercise proper jurisdiction over this case, however, we would nevertheless find the primary jurisdiction doctrine inappropriate because the issues of contract interpretation here are neither beyond the conventional expertise of judges nor within the special competence of the PSC. *Compare Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.,* 1996 WL 32891, *2–3 (E.D.Pa. Jan. 23, 1996) (finding application of primary jurisdiction doctrine proper in a power purchasing agreement case when disputed issue concerned technical application of Public Utility Commission's curtailment regulations). Therefore, we affirm the district court's denial of Niagara's motion to

dismiss on the basis of the primary jurisdiction doctrine.

## II. Grant of Summary Judgment in Favor of Fulton

We turn next to Niagara's claim that the district court erred in granting summary judgment to Fulton. The district court found that the Agreement obligated Niagara to purchase from Fulton all electricity delivered by Fulton at the 6¢/Kwh rate, so long as such quantities were not unreasonably disproportionate to the stated estimates within the contract. The court further found that, as a matter of law, Fulton never produced an amount of electricity that exceeded commercially reasonable expectations. Niagara contends that the district court erred because the existence of genuine issues of material fact regarding the role of capacity and commercially reasonable expectations preclude summary judgment.

 Summary judgment is mandated when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In a breach of contract action, summary judgment is appropriate "[w]here the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir. 1985); *State v. Peerless Ins. Co.,* 108 A.D.2d 385, 390, 489 N.Y.S.2d 213, 218 (1st Dept. 1985), *aff'd,* 67 N.Y.2d 845, 501 N.Y.S.2d 651, 492 N.E.2d 779 (1986).

The district court found that the Agreement between Fulton and Niagara was an output contract, and as such was subject to good faith and commercial standards of fair dealing. Based upon this finding and the recent case of *Philadelphia Corp. v. Niagara Mohawk Power Corp.,* 207 A.D.2d 176, 621 N.Y.S.2d 237 (3d Dept.1995), the district court held that the capacity and energy estimates in the first Whereas clause of the Agreement did not create absolute maximums limiting Niagara's obligation to purchase electricity.

 We agree with the district court and reject Niagara's claim that the parties intended "a capacity of approximately 47 megawatts, and ... annual production of approximately 392,000 Megawatt-hours" to mean "no more than 47 megawatts of capacity and 392,000 megawatthours of energy." In *Philadelphia Corp.,* a breach of contract action involving power purchasing agreements defining the electricity to be sold "in terms of approximate capacity and approximate annual production," *id.* at 177, 621 N.Y.S.2d 237, the court found that the estimates stated in the contracts were targets, not maximums or minimums. The court held:

> [D]efendant is obligated to purchase and plaintiffs are obligated to sell electricity in such quantities which are not unreasonably disproportionate to the stated estimates within the contracts.... While the estimates are not absolute maximum quantities beyond which the contracts do not apply, ... neither may plaintiffs modify their outputs beyond the normal range commercially consistent with the capacity estimates used in the contracts....

*Id.* at 177–78, 621 N.Y.S.2d 237. *Philadelphia Corp.* directly controls the interpretation of the capacity and energy estimates in this case. Thus, we affirm that portion of the district court's opinion holding that the Agreement unambiguously obligates Niagara to purchase and Fulton to sell electricity in quantities not unreasonably disproportionate to the stated estimates within the Agreement.

 The district court also found that, as a matter of law, Fulton's production never exceeded commercially reasonable expectations. The court reasoned that the only relevant estimate in the Agreement was the "annual production of approximately 392,000 megawatthours of energy." The court held that since Fulton never exceeded this yearly

energy estimate, it did not breach the Agreement, regardless of whether it exceeded the capacity estimates in the Agreement. In finding that "approximately 392,000 megawatthours" was the only relevant estimate in the Agreement, the district court relied on the parties' stipulation that Niagara purchased energy, not capacity, from Fulton and upon the fact that the Agreement called for payment on the basis of kilowatthours rather than kilowatts. We disagree with the district court that these two facts lead inexorably to the conclusion that the capacity estimate does not affect the parties' obligations under the Agreement.

■ There are several reasons why we believe the level of capacity may be read as a material term of the Agreement. As an initial matter, contracts should be construed so as to give effect to all provisions. *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir.1992). The district court's interpretation of the contract leaves the capacity estimate completely ineffectual.

Additionally, as the parties agree, energy is the *usage of capacity over time*. Therefore, one cannot speak of energy apart from capacity: energy is defined in terms of capacity. As explained in the affidavit of Mark Barry, a manager of the Plant, "[t]he amount of energy which a gas turbine generator set, or any electric generator, can produce is a function of its capacity during each hour it is on line and the total number of hours on line."

Indeed, it seems that a central purpose of the Agreement would be defeated if capacity were not considered a material term. The purpose of estimates in power purchasing agreements is to allow utilities to plan accurately for generation and load. As the PSC explained in one ruling:

Electric system reliability demands that utilities continuously match generation and load. Planning for future electric needs

thus requires firm estimates of the expected amount *and timing* of on-site generation that will be sold to utilities.

Representations in purchase agreements as to the size and type of a facility are a key underlying source of information regarding the amount of non-utility generation available.

*Indeck-Yerkes Energy Services, Inc.*, NYPSC Case No. 88–E–114, Declaratory Ruling at 3 (Sept. 14, 1988) (emphasis added), *aff'd*, 164 A.D.2d 618, 564 N.Y.S.2d 841 (3d Dept.1991). If the capacity estimate were not material, Fulton would be allowed to deliver electricity without regard to timing. For example, Fulton could deliver all 392,000 megawatts of energy during one part of the year (by using a higher capacity level) and deliver none during the remainder. However, electricity amounts must be predictable over time because electricity cannot be efficiently stored for later use. Electricity is not a commodity like steel beams that can be stored and passed out to the ultimate consumer as need demands. Rather, Niagara could be left with unusable energy and an inability to meet consumers' needs efficiently if the capacity estimate were not a material term of the Agreement subject to the standard of commercial reasonableness.

For these reasons, we believe that both the energy and capacity estimates in the Agreement are material terms subject to standards of commercial reasonableness.[5]

■ The district court also found that even if it were to take capacity into account, the capacity variance never exceeded commercially reasonable expectations. We vacate this portion of the court's opinion because we find that there remain disputed issues of fact regarding whether the variances at issue in this case were reasonable.

Although there is evidence in the record of the Plant's billing history, including total

---

5. Though Fulton urges otherwise, the case of *Energy Tactics, Inc. v. Niagara Mohawk Power Corp.*, —— A.D.2d ——, 631 N.Y.S.2d 697 (2d Dept.1995) does not alter our decision in this case because in *Energy Tactics* the energy output, not the capacity, exceeded the contract estimate, which was construed to cover only the first year of a twenty year contract. The court there did not discuss the materiality of capacity estimates directly, though in upholding the cogenerator's claim to full payment on the added output after the first year (when a second generator went into operations as contemplated in the contract), it recognized that the 1.0 capacity of both generators enabled an output in excess of about 50% of the stated estimate.

monthly Kwh generation, we cannot discern from the evidence the variance of the Plant's capacity over the course of the Agreement. In this regard, evidence of the proper way to measure or analyze capacity must be presented to illuminate the parties' reasonable expectations of the Plant capacity. Fulton, it appears, would ask the court to look to aver-age annual capacity, whereas Niagara would argue for capacity on the basis of four hour periods of time. Each of these methods produce wildly different results and may lead to different conclusions regarding the parties' performance under the Agreement.

Specific evidence regarding the cause of the capacity variance in the Plant is also needed. The parties agree that the capacity of gas-fired plants can vary based upon air temperature. Fulton claims that variances in this Plant are solely the result of these ambient air temperature changes, not of any Plant design modification, and thus are fully within the reasonable expectations of the parties. Niagara claims to be able to prove through specific expert testimony that the Plant's capacity level can be controlled by Fulton. Niagara's claim seems to gain support from the Barry affidavit, submitted by Fulton, in which Barry explains that ambient air temperature changes are but one factor affecting capacity: fuel gas supply pressure and the amount of steam recovered and injected back into the generator, rather than sent to the Nestle factory, may also affect capacity levels. The degree of Fulton's control over the capacity variance at the Plant may thus be crucial to the ultimate outcome of this case. PSC rulings have stated that capacity variances that occur due to post-contract changes in a plant's design or party's behavior are not covered by the contract. *See American Ref–Fuel Co.,* NYPSC Case No. 90–E–0238, Declaratory Ruling at 9 (Aug. 22, 1990); *Indeck–Yerkes, supra,* Declaratory Ruling at 5.

However, Fulton may indeed prevail in this case if it can prove that the capacity variance was not within its control and the variance at issue here was within the contemplation of the parties. We hold, though, that such issues cannot be resolved as a matter of law at this juncture. We therefore vacate the portion of the district court's opinion finding that the capacity variance did not exceed commercially reasonable expectations.

We emphasize that our decision concerns only the propriety of summary judgment as a means of resolving the role of capacity in the Agreement. We do not comment on the merits of Niagara's claims regarding its uni-lateral change in payment methodology. We simply find that disputed issues of fact exist with respect to the parties' commercially rea-sonable expectations and the capacity vari-ance of the Plant.

### III. Denial of Summary Judgment In Favor of Niagara

Niagara asserts that summary judgment should be granted in its favor because it acted properly under the Agreement and PSC rules. We affirm the district court's decision denying Niagara summary judgment because, as we stated above, there remain disputed issues of material fact that preclude a decision regarding whether either party acted properly under the Agreement.

### CONCLUSION

We reverse and vacate in part the district court's grant of summary judgment to Fulton, and remand for a factual determination whether the capacity variances of the Fulton Plant were commercially reasonable. In all other respects, we affirm the able decision of the district court.