■ PHILADELPHIA CORPORATION et al., Plaintiffs, and VICTORY MILLS HYDRO COMPANY, INC., Respondent, v NIAGARA MOHAWK POWER CORPORATION, Appellant. [723 NYS2d 549] —Cardona, P. J. Appeal from a judgment of the Supreme Court (Viscardi, J.), entered December 14, 1999 in Warren County, upon a decision of the court in favor of plaintiffs.

The facts of this case are set forth in our previous decision (207 AD2d 176) and are stated herein as relevant to this appeal. Plaintiff Victory Mills Hydro Company, Inc. (hereinafter plaintiff) is the owner of a hydroelectric generating facility. Defendant, a public utility, is required by contract to buy plaintiff's entire output of electricity in accordance with the requirements of the Federal Public Utility Regulatory Policies Act of 1978 (16 USC § 824a-3) and Public Service Law § 66-c. Plaintiff's plant is a "run of the river" facility which cannot reservoir water and generates electricity based on the natural and variable flow of water from season to season. According to plaintiff's output contract, signed in 1986,[1] plaintiff is to provide "approximately" 4,500 megawatt hours (hereinafter mWh) of electricity per year[2] to defendant with an estimated generating capacity of "approximately" 1.2 megawatts (hereinafter mW).[3] While this information describing the output and nameplate capacity of the plant is detailed in the 1984 license for the facility from the Federal Energy Regulatory Commission (herein-

---

1. This output contract was actually entered into between defendant and SNC Hydro, Inc., plaintiff's predecessor in interest.

2. Between January 1, 1986 and December 31, 2000, defendant was to purchase plaintiff's output pursuant to a fixed, annually escalating price schedule per kilowatt hour. From January 1, 2001 to December 31, 2025, defendant was to pay the greater of either any statutory minimum rate or its actual cost avoided as determined by the Service Classification rate number six or SC-6, which reflects the Public Service Commission's calculation of avoided short-term power purchases by a utility.

3. The latter figure is the plant's "nameplate capacity" and reflects the theoretical maximum amount of energy that can be produced by the plant in one hour.

after FERC), that license was amended in 1990, without objection, to reflect that the plant had an actual installed capacity of 1.656 mW based on the installation of a single large turbine rather than the original three smaller turbines. From January 1987 until November 1992, defendant purchased, without complaint, all of the electricity produced at plaintiff's plant at the full contract price even though its annual output in some years exceeded 4,500 mWh.

The current dispute arose in 1992 after defendant notified plaintiff and various other hydroelectric plants[4] that, effective November 1, 1992, it would pay the full contract price for only a certain amount of the plants' output of electricity and would pay a lower rate for any output in excess of the described amounts. The plants claimed that their contracts required defendant to purchase all output at full contract prices and brought this action in 1993 seeking a declaratory judgment and monetary damages for breach of contract. Although Supreme Court denied the parties' cross motions for summary judgment, this Court, *inter alia*, granted partial summary judgment with respect to the interpretation of the contracts, finding them to be unambiguous (207 AD2d 176, *supra*). We declared, *inter alia*, that: "in those output contracts with stated estimates, plaintiffs are required to sell and defendant is required to purchase such quantities of electricity as are, in good faith and in compliance with standards of commercial fair dealing, reasonably proportionate and commercially consistent with such estimates" (*id.*, at 180).

Thereafter, following a nonjury trial, Supreme Court, *inter alia*, determined that the New York State Dam plant, a facility operated by plaintiff NYSD Limited Partnership, had substantially increased capacity beyond contract estimates and required defendant to pay the contract rate for only a fraction of that plant's total output. With respect to plaintiff's generating facility, however, the court did not "find from the proof in this record that the output has been unreasonably disproportionate to the reasonable expectations of the parties as quantified by the estimate in [plaintiff's] contract." Thus, the court concluded that plaintiff was entitled to payment for the entire output of the hydroelectric plant at the full contract price. Defendant appeals.

We affirm. Contrary to defendant's argument, Supreme Court's judgment herein does not violate this Court's prior de-

---

4. This lawsuit originally involved 20 output contracts (207 AD2d 176, *supra*), however, plaintiff's contract is the only remaining agreement in dispute.

cision which interpreted the contract to require defendant to pay the full contract price for so much of the facilities' output as was not unreasonably disproportionate to or commercially inconsistent with the estimated output stated in the contract nor caused by bad faith on the part of the generating facility. Our review indicates that Supreme Court sufficiently followed this Court's conclusion that the contract output estimates were not to be treated as absolute maximums.[5] Instead, such estimates were to frame the range of reasonable variation, taking into account the fact that the generating facilities could not "modify their outputs beyond the normal range commercially consistent with the capacity estimates used in the contracts" (*id.*, at 179).

The record demonstrates that, in rendering its decision as to plaintiff, Supreme Court appropriately focused on the issues identified in this Court's 1995 decision, namely, a determination as to how much of a facility's overgeneration is entitled to the full contract rate from defendant, in light of the applicable standards of commercial reasonableness and good faith (*see*, UCC 2-306 [1]). With respect to plaintiff's facility, although Supreme Court found that plaintiff increased the nameplate capacity of the plant by 38%, from 1.2 mW to 1.656 mW, it also concluded: "In view of the wide variation due to hydrologic conditions and the fact that in the early years the average production [of] the plant is only 14% over the contract amount, this court without site specific data is unable to conclude that the plant was modified such that its output would be beyond the normal range commercially consistent with good faith and fair dealing. In short, there is no showing that the plant has generated greater electrical output due solely to its increased name plate capacity over the capacity stated in the contract. Absent a showing that the output over a short period of time (e.g., one hour, one day) exceeded the capacity in the contract any increase may be due to river conditions and their persistence, not an increase in capacity."

Although this Court has a "broad scope of review in a nonjury trial, we accord great deference to the credibility determinations rendered by the trial court due to its ability to view the

---

**5.** While it is true, as pointed out by defendant, that certain of the testimony offered by the generating facilities concerned their understanding of the contract terms, including the negotiation thereof, and, therefore, violated the parol evidence rule (*see, Finch, Pruyn & Co. v Wilson Control Servs.*, 239 AD2d 814, 817), since this Court previously ruled that the contracts were unambiguous (207 AD2d 176, 178, *supra*), we do not find that Supreme Court improperly relied on this evidence in rendering its final judgment.

witnesses and the evidence firsthand" (*Auger v State of New York*, 263 AD2d 929, 930). Here, Supreme Court's conclusions are supported in this record by, *inter alia*, the testimony of the generating facilities' witnesses who concentrated on the variation in output of hydroelectric plants from year to year. As for plaintiff's plant in particular, Raymond Cunningham, an engineering consultant, testified that the normal range of variation for plaintiff's plant over a 10-year period would be between 3,431 mWh and 5,569 mWh per year, with slightly larger variation expected over longer periods of time. Cunningham concluded that the output from plaintiff's plant over a 10-year period fell within the expected annual variation with the exception of the year 1990, which was an abnormally high year for almost every plant. Cunningham explained that such a variation in output for one year would be expected in a 10-year time period. In this regard, one of defendant's experts, Frank Graves, acknowledged that "there is a considerable hydrologic variance in the output from these units that is uncontrollable, and in that sense, normal in terms of output."

While defendant challenges both the methodology and conclusions reached by Cunningham, neither of defendant's expert witnesses similarly calculated the normal variance in generation of each plant, a factor we found to be significant (207 AD2d 176, 179, *supra*). Notably, the documentary evidence demonstrates that, except for the anomalous 1990 output, plaintiff has consistently produced within 1,000 mWh of the contract estimate, safely within the normal expected variation calculated by Cunningham. Thus, separate and apart from the issue of whether the increase in plaintiff's nameplate capacity was in good faith, Supreme Court properly concluded, upon the record herein, that plaintiff's past overgeneration was within commercially reasonable limits and any excess output by plaintiff's plant was consistent with standard hydrological variation as opposed to the change in turbines.

Turning to the remaining argument, defendant maintains that by installing one large turbine with a 1.656 mW capacity rather than three smaller turbines with a 1.2 mW capacity as set forth in the contract, plaintiff has operated in bad faith and is not entitled to the full contract rate on its excess production. It is true that the issue of a plant's nameplate capacity is a material issue subject to standards of commercial reasonableness. We also agree that the postcontract change in capacity at plaintiff's plant gives good cause to closely examine this issue (*see, Matter of Indeck-Yerkes Energy Servs. v Public Serv. Commn.*, 164 AD2d 618; *see also, Fulton Cogeneration Assocs.*

*v Niagara Mohawk Power Corp.*, 84 F3d 91, 99). However, this contention was thoroughly examined at trial and even defendant's own expert proof confirmed that nameplate capacity is only one factor in determining output, especially in a run of the river plant, and, furthermore, an increase in nameplate capacity results only in the *potential* of increased output over time. Since there is no proof in the record that the change in turbines was undertaken in bad faith and there is, in fact, proof demonstrating that plaintiff's output has not increased beyond what was reasonably contemplated in the original agreement, we cannot agree with defendant that reversal is warranted.

Mercure, Crew III, Spain and Mugglin, JJ., concur. Ordered that the judgment is affirmed, with costs.