**DURABLE, INC. d/b/a and a/k/a Durable Aluminum, Plaintiff,**

v.

**TWIN COUNTY GROCERS CORP. d/b/a Alpine Distributors, Defendant.**

No. 91 Civ. 1500 (VLB).

United States District Court, S.D. New York.

Dec. 15, 1993.

---

Donald L. Sapir, White Plains, NY, Arnold & Kadjan Chicago, IL, for plaintiff.

Roger B. Kaplan, Wilentz, Goldman & Spitzer, New York, NY, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This case presents the question of the effect during contract negotiations between two sophisticated business entities of transmission by a party of a list of thirteen proposed points including the need for a "[f]irm offer in writing," and not containing a quantity term. I find that the requirement of a "firm offer in writing" prevents the writing of "Accepted" on such a paper from creating a contract.

I further conclude that such a requirement prevents incomplete earlier or subsequent papers from being used to piece together a binding agreement, and that none of the documents submitted in this case satisfy the statute of frauds contained in Uniform Commercial Code 2–201.

### II

Plaintiff ("Durable"), a supplier of aluminum kitchenware, alleges that the parties entered into a contract obligating defendant ("Alpine"), a buying group purchasing such items for numerous retailers, to buy all of its requirements for aluminum goods from Durable for a three (3) year period, and that Alpine breached that contract. Alpine acknowledges having negotiated with Durable concerning the possibility of an arrangement of this type, but denies that an agreement was ever reached. No single document reflecting a final agreement or signed by both parties is extant.

Jurisdiction is predicated upon diversity of citizenship under 28 U.S.C. 1332; New York law is applicable pursuant to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Alpine filed a motion under Fed.R.Civ.P. 12(b)(6) to dismiss the complaint, which I denied on October 1, 1991. Both parties thereafter filed pre-discovery motions for summary judgment under Fed.R.Civ.P. 56.

Alpine's motion was based on the statute of frauds for sales of goods in excess of $500 contained in Uniform Commercial Code § 2–204. Durable's motion sought partial summary judgment on the question of liability. I concluded that further factual development was necessary and denied both motions without prejudice.

After completion of discovery, Alpine has renewed its motion for summary judgment on grounds of lack of evidence of entry into a contract, and of absence of a writing satisfying Uniform Commercial Code 2–201(1). I grant Alpine's motion on both grounds.

### III

The principal events concerning the dealings between the parties appear undisputed, although their characterization is hotly contested. For purposes of Alpine's motion, I accept plaintiff Durable's factual description of those events. The facts claimed, however, make it "implausible" that a contract was agreed to, and as indicated in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), this requires the claimant to "come forward with more persuasive evidence to support [the] claim than would otherwise be necessary." Id. Far from doing so, the testimony of plaintiff's executives tends to negate the existence of the claimed agreement.

### IV

During 1989, the parties began discussing a possible long-term supply contract. Durable sent various proposals to Alpine in October 1989 and February 1990, but it is not alleged that these were accepted. On March 2, 1990, Alpine sent by telefax on its stationery to Durable, an outline consisting of thirteen (13) points of possible contract terms (attached to this memorandum order as Exhibit A). The last item of this telefax read:

"13) Firm offer in writing."

The telefax:

(a) was not dated

(b) was not signed

(c) did not contain the name of the addressee or proposed contracting party

(d) did not set forth any quantity of goods

(e) contained no overall financial total or commitment

(f) contained no line for signature by the addressee

(g) set forth no timetable for acceptance

(h) did not refer to any specific prior proposals or particulars of their content [1]

(i) did not mention the name of any officer of the sending entity who was transmitting the telefax.

On March 5, 1990, the president of Durable wrote in handwriting at the foot of the telefax "All 13 points accepted," followed by a signature and date, and according to Durable witnesses initiated a process which might have been expected to have led to transmission of the signed version to someone at Alpine.

Discussions about how potential purchases by Alpine from Durable might be implemented followed but no firm orders were placed or shipped; Alpine sent to some of its member stores an undated comparison sheet showing Durable and a competitor's prices. On April 27, 1990, according to Durable's evidence, a Durable official met with an Alpine merchandising manager at which time the Alpine manager said orally "we have a deal" (of unspecified nature), and that orders would be forthcoming.

On May 17, 1990, Durable sent a telefax to Alpine complaining of failure of Alpine to order pursuant to "our agreement" but setting forth no details of it. Alpine did not reply to that document. This litigation followed.

### V

■ Contract law gives equal weight to the ability to make binding agreements and the ability to avoid doing so when contractual intent is not manifested. It has long been recognized that "stability and predictability

---

1. Prior to the 13–point telex, discussions of various potential quantity and price terms had taken place and unsigned, unaccepted proposals had been exchanged.

in contractual affairs is a highly desirable jurisprudential value." *Sabetay v. Sterling Drug,* 69 N.Y.2d 329, 336, 514 N.Y.S.2d 209, 213, 506 N.E.2d 919 (1987).

Fear of entanglement in unintended commitments, and of failure of others to honor commitments, are equally inimical to the efficient conduct of business vital to a functioning economy. See generally Farnsworth, "Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations," 87 Colum.L.Rev. 217 (1987); Jones, "The Jurisprudence of Contracts," 44 U.Cinc.L.Rev. 43 (1975).

■ Where a writing sent by the party to be bound to the other specifically indicates that an additional agreed-upon writing is contemplated prior to entry into a binding contract, this indication of intent should be honored. *Arcadian Phosphates v. Arcadian Corp.,* 884 F.2d 69, 72–73 (2d Cir.1989); *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78 (2d Cir.1985); *R.G. Group v. Horn & Hardart,* 751 F.2d 69 (2d Cir.1984); *Ogden Martin Systems v. Tri–Continental Leasing,* 734 F.Supp. 1057 (S.D.N.Y.1990); *TIAA v. Tribune Co.,* 670 F.Supp. 491, 497–99 (S.D.N.Y.1987).

■ Otherwise, as pointed out by Judge Leval in *TIAA v. Tribune Co.,* 670 F.Supp. at 497, the result would be that of "trapping parties in surprise contractual obligations that they never intended." For a major commitment of this type to be entered into without a writing containing all critical terms and signed by the party to be charged is "implausible" under *Matsushita* in the same way as it would be counterintuitive to assume that labor-management negotiators would "sign a contract with a disputed wage term." *Eastern Air Lines v. Air Line Pilots Ass'n,* 861 F.2d 1546, 1551 (11th Cir.1988). This implausibility is heightened rather than overcome by the aspects of Appendix A to this memorandum order outlined above, and particularly by its Point 13.

The importance of caution in permitting inferences of long-term contracts where the party to be charged authors a writing seeking to avoid premature commitment is buttressed by the concerns underlying New York General Obligations Law ("GOL") 5–701(a)(1), concerning contracts by their terms not to be performed within one year. Legislative alterations in GOL 5–701 as recently as N.Y.L.1978 ch. 199 § 1, without deletion or amendment of subsection (a)(1), indicate that its objectives have continuing importance, and hence are persuasive here even though subsection (a)(1) is not specifically invoked or necessarily applicable here. See *Zendman v. Harry Winston, Inc.,* 305 N.Y. 180, 189 n. 3, 111 N.E.2d 871 (1953); Stone, "The Common Law in the United States," 50 Harv.L.Rev. 4, 12–18 (1936).

## VI

Uniform Commercial Code 2–204(1) provides that a contract for sale of goods "may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of the contract." See *Apex Oil Co. v. Vanguard Oil & Service Co.,* 760 F.2d 417 (2d Cir.1985). Section 2–204 does not avoid the applicability of the statute of frauds, which forms a further barrier to Durable's claim as discussed below; the Official Comment to § 2–204 states that the "legal effect of such an agreement is, of course, qualified by other provisions of this Article."

The circumstances here even apart from the clearly preliminary, noncontractual text of the key Thirteen Point document (Appendix A) do not buttress Durable's claim, but rather reinforce its implausibility.[2] While the parties were clearly discussing the possibility of a contract, the behavior of Durable executives is inconsistent with its claim that an agreement was actually negotiated.

On February 19, 1990 Durable claims to have sent a proposal for an arrangement under which Alpine would purchase $1.7 million in aluminumware orders from Durable (Appendix C to this memorandum order). Gary Anders, Durable's president who signed this document, testified at his deposition that

---

2. "The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement, but their actions may be frequently conclusive on the matter despite the omissions." Official Comment, Uniform Commercial Code 2–204.

he gave it to Mark Halpern, Durable's vice president for sales, but had no knowledge of what Halpern did with it. Halpern, in turn, at first testified that he believed it was faxed to Alpine, but then recalled that it was faxed to Sy Hofstetter, a Durable sales agent and had no knowledge of what happened to it after that. Mr. Hofstetter testified that he did not send the document to Alpine and had no knowledge of whether anyone else did so.

Anders also inscribed "All 13 Points Accepted" on Appendix A to this memorandum order, quoted above (the endorsed document is attached to this memorandum order as Appendix B). Anders testified at his deposition that he gave the endorsed copy to his secretary, Beverly Rockefeller, on March 5, 1990 with instructions to mail it, but with no statement. According to Anders, he gave it to Ms. Rockefeller without indicating to whom it should be mailed, and without a cover letter or accompanying note. Ms. Rockefeller had no recollection of the matter. Mr. Hofstetter, Durable's sales representative, testified that he never saw the March 5, 1990 "acceptance" of the Thirteen–Pint document (Appendix A).

Such cavalier treatment of documentation involving a transaction of the magnitude asserted by Durable, and relied upon as contractual in nature, is inconsistent with Durable's contention that either it or Alpine intended to be bound as a result.

## VII

Durable points to numerous individually nonbinding interactions between the parties

as indicating that an overall binding agreement had been concluded. The logic of this argument is faulty. The fact that business is contemplated—or even that conclusion of an overall contract is hoped for or believed to be a foregone conclusion—does not indicate whether or not an actual agreement was in fact reached. Many are the slips between cup and lip in agreements of all types—including the settlements of lawsuits.

Parties can and do conduct business relationships without binding overall contracts, or during discussion of whether or not to enter into a more binding or longer-lasting relationship. If this is kept in mind, various subsequent events are as consistent with continuing negotiations, the hope of agreement, or the possibility that some business might be done without a binding umbrella relationship, as with entry into a large-scale long-term contract of the type claimed by Durable.

Nonbinding arrangements based on mutual expectations or common interests are often even more effective in promoting coordination of activity than formal agreements, and indeed have the advantage that either party can terminate such an informal arrangement at will.[3]

## VIII

■ Uniform Commercial Code 2–201(1) requires a writing signed by the party to be charged or authorized agent for enforcement of a contract for sale of goods for more than $500. Neither the Thirteen Points (Appen-

---

3. See generally Corbin, "Non–Binding Promises as Consideration," 26 Colum.L.Rev. 550 (1926); Note, 37 Clev.St.L.Rev. No. 1 at 149 (1889); T. Schelling, *The Strategy of Conflict* (1960). Such arrangements are often used to permit potentially clashing nations to avoid open conflict without compromising their rights. See 1 S. Ambrose, *Eisenhower* 452–53 (1983); 2 *Winston S. Churchill: His Complete Speeches 1897–1963* at 1924–25 (Bowker 1974); G. Allison, *Essence of Decision* (1971). Indeed, the SALT–II nuclear weapons agreement was never ratified by the United States or the former Soviet Union, but observed to a large extent by both because of mutual expectations of the consequences of contravening it.

Many combinations challenged under antitrust principles also involve nonbinding collaborative arrangements. See *American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1138–39; 90 L.Ed. 1575 (1946); *Interstate Circuit v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939); Nye, "Can Conduct Oriented Enforcement Inhibit Conscious Parallelism?," 44 Antitrust L.J. 206 (ABA 1975); see also L. Telser, *Competition, Collusion and Game Theory* (1971); D. Dewey, *The Theory of Imperfect Competition* (1969); E. Chamberlin, *The Theory of Monopolistic Competition* (6th ed. 1948); see also *United States v. Kissel*, 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910); *United States v. Dynalectric Co.*, 859 F.2d 1559, 1569 (11th Cir. 1988) (the concept of "combination" under the antitrust laws is much broader than that of "conspiracy").

dix A) or any other document in this case satisfies this requirement.

Only by assuming that other material *not* signed or accepted by Alpine can be used to fill in the crucial quantity term necessary to a contract,[4] can the Thirteen Points (Appendix A) constitute a complete proposed agreement, even disregarding its requirement for a "Firm offer in writing."

Section 2–201(2) permits a confirmation "sufficient against the sender" to be effective between merchants unless written notice of objection is given within ten days of receipt. Durable argues that a memorandum of May 17, 1990 (Appendix D to this memorandum order) meets this criterion. It does not. Rather than setting forth any contract terms "sufficient against the sender," the May 17 document merely assumes that Alpine's purchasing from a competitor was contrary to what Durable called "our agreement" and that Durable's president was "going through the roof."

Appendix D expresses anger at the breakdown of a potentially profitable relationship and seeks to place the blame on its recipient rather than seeking to confirm the existence of an agreement. It does not purport to be a confirmation. Instead, it constitutes a protest. In this context it would be illogical to insist that the recipient send a reply objecting to the communication on pain of being treated as having entered into a contract otherwise barred by a statute of frauds.

SO ORDERED.

### APPENDIX A

Alpine Distributors
250 West Nyack Road
West Nyack, New York 10994
(914) 623–1300

1) *3 year commitment.*

2) *$25,000.00 advertising allowance.*

3) *1% spoils allowance/quarterly.*

4) *Everyday price of .549 for bag goods at $1.79 retail.*

---

**4.** A physical or monetary quantity term is essential to an effective contractual writing. *Bazak International v. Mast Industries,* 73 N.Y.2d 113, 538 N.Y.S.2d 503, 505, 535 N.E.2d 633 (1989);

5) *Special cost on lasagna pans of .76¢.*

6) *Roaster prices not to exceed .59¢ or meet competitive offers.*

7) *Terms 2%/45/46.*

8) *Pay ½ of $250,000.00 on date of first order with other half on July 1st.*

9) *Make year 2 & 3 payments payable on anniversary dates on acceptance of offer.*

10) *Relieve Alpine Distributors of any liability if Durable is unable to service us at an acceptable level.*

11) *Buy back remaining EZ Por warehouse inventory.*

12) *Make Alpine a house account.*

13) *Firm offer in writing.*

### APPENDIX B

Alpine Distributors
250 West Nyack Road
West Nyack, New York 10994
(914) 623–1300

1) *3 year commitment.*

2) *$25,000.00 advertising allowance.*

3) *1% spoils allowance/quarterly.*

4) *Everyday price of .549 for bag goods at $1.79 retail.*

5) *Special cost on lasagna pans of .76¢.*

6) *Roaster prices not to exceed .59¢ or meet competitive offers.*

7) *Terms 2%/45/46.*

8) *Pay ½ of $250,000.00 on date of first order with other half on July 1st.*

9) *Make year 2 & 3 payments payable on anniversary dates on acceptance of offer.*

10) *Relieve Alpine Distributors of any liability if Durable is unable to service us at an acceptable level.*

11) *Buy back remaining EZ Por warehouse inventory.*

12) *Make Alpine a house account.*

13) *Firm offer in writing.*

All 13 points accepted

[Signature]

[Date]

Official Comment No. 1 to UCC 2–201; *International Commercial Resources v. Jamaica Public Services,* 612 F.Supp. 1153 (S.D.N.Y.1985), *aff'd* 805 F.2d 390 (2d Cir.1986).

APPENDIX C

DURABLE®

P.O. Box 59231
933 E. Remington Road
Schaumburg, IL 60159
Phone 312–843–1100
FAX 312–843–0764

February 19, 1990

ALPINE DISTRIBUTORS

Based on 1.7 million dollars per year of foil bakeware purchases, Durable will give Alpine Distributors/Twin County Grocers, $600,000 for a three year sales agreement-payable at $200,000 at the end of each year.

(s) Gary Anders

GARY ANDERS, President

APPENDIX D

DURABLE®

P.O. Box 59231
933 E. Remington Road
Schaumburg, IL 60159
Phone 312–843–1100
FAX 312–843–0764

DATE 5/17/90

TO: ALPINE DISTRIBUTORS

ATTN: FRANK PATRICK

SUBJECT: _____

SENDER: MARK H. HALPERN

TOTAL NUMBER OF PAGES: _____

Dear Frank:

Since you have not returned my telephone calls and I have to leave shortly, I need to let you know that our President is very disturbed because of what Mark told me about your orders to EZ–Foil. Durable has already purchased 1,000,000 dollars in aluminum specifically for Alpine's requirements based on our agreement and he is quite upset. Mark told me that he is placing an order with us any day now for the last 3 weeks, and this is what I told our President. The man is going through the roof. I need the initial order. Please call me.

Sincerely yours,

(s) Mark H. Halpern

MARK H. HALPERN

Vice President Sales