**FARAGO ADVERTISING, INC., Plaintiff,**

v.

**HOLLINGER INTERNATIONAL, INC. Defendants.**

**No. 00 CIV. 8730(VM).**

United States District Court, S.D. New York.

Aug. 15, 2001.

254

Alan Effron, New York City, for Plaintiff.

Geri S. Krauss, Herrick, Feinstein L.L.P., New York City, for Defendants.

## AMENDED DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Farago Advertising, Inc. ("Farago Advertising") has sued Defendant Hollinger International, Inc. ("Hollinger") for breach of contract in connection with the development of an advertising campaign in 1999. Plaintiff's Memorandum of Law ("Pl.'s Mem.") at 7. The parties now cross-move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Farago Advertising's motion for summary judgment is denied, Hollinger's is granted, and the complaint is dismissed.

## BACKGROUND

In June 1999, Farago Advertising, a New York-based company, started work on an advertising project for Hollinger, a Chicago-based newspaper publisher (Pl.'s Mem. at 2; Farago Affidavit, dated Feb. 1, 2001 ("Farago Aff."), ¶¶ 2–4; Answer, dated Dec. 28, 2000 ("Answer"), ¶ 4, attached as Ex. B to Farago Aff.)

Paul B. Healy ("Healy"), Vice President of Corporation Development and Investor Relations for Hollinger, and Peter Farago ("Peter Farago"), President of Farago Advertising, stated that the business relationship began as a verbal agreement, the only term of which was a monthly payment in return for work performed. Healy Affidavit, dated April 6, 2001 ("Healy Aff."), ¶ 3, attached to Defendant's Notice of Cross–Motion for Summary Judgment ("Def.'s Notice"); Farago Deposition Transcript, dated Mar. 9, 2001 ("Farago Dep. Tr."), at 28–29, attached as Ex. B to Def.'s Notice. Healy characterized the work as the development of an advertising pitch. Healy Aff. ¶ 9.

Farago Advertising contends that advertising contracts customarily include a 90–day termination clause because an agency often needs to "staff-up" to service a new client, and it takes time to reassign or discharge that staff. Pl.'s Mem. at 4; Farago Aff. ¶ 9. In this connection, Peter Farago asserted that Farago Advertising did

make several staffing changes in order to serve Hollinger. Farago Dep. Tr. at 53.

As Farago Advertising worked on these advertisements—which Farago Advertising ultimately presented to Hollinger executives, including chairman and CEO Conrad Black ("Black")—Farago Advertising and Hollinger negotiated the terms of a written contract for the sale of advertising services. A central issue in these negotiations was whether the agreement would require one party to notify the other before terminating the relationship. Pl.'s Mem. at 4; Farago Aff. ¶ 8.

In October 1999, Healy and Peter Farago discussed the notice requirement. Pl.'s Mem. at 4. Healy denied that this or any other discussion resulted in an agreement on the termination provision:

> We compromised on a 60–day notice provision. We did not discuss the form of the notice or whether it was to be oral or written. Most significantly, *Peter Farago and I did not agree that the 60–day notice provision in any way modified our existing verbal month-to-month agreement or that Hollinger would be bound to this provision in any way merely as a result of these discussions.* Rather, we agreed that the attorneys who were handling the drafting and negotiating of the Draft Agreement, Loye and Wolf, would further discuss the exact language and details of such a provision.

Healy. Aff. ¶ 13 (italics in original).

On October 13, 1999, after the discussion between Healy and Peter Farago, Farago Advertising's outside counsel, Jamie Wolf ("Wolf"), proposed to Linda Loye ("Loye"), in-house counsel and assistant secretary for Hollinger, specific language for a termination provision. Pl.'s Mem. at 5; Farago Aff. ¶¶ 11–12.

Hollinger has stated that while Loye played a role in the negotiations with Farago Advertising, Hollinger never expressly empowered Loye to assent to a contract on Hollinger's behalf, nor did Loye exercise such authority in practice. Healy Aff. ¶ 7. Similarly, Loye asserted that "at no time was I ever acting as a principal and I certainly never represented to anyone at Farago that I was authorized to enter into any binding agreements on behalf of Hollinger." Loye Affidavit, dated Apr. 6, 2001 ("Loye Aff."), ¶ 3, attached to Def.'s Notice.

Wolf conceded that Loye "possibly" made clear on several occasions that she needed to check with Hollinger for approval on provisions of the contract. Wolf Aff. at 94. At another juncture, Wolf stated that he "wasn't aware" and "didn't know" whether Loye had the authority to bind Hollinger in an agreement. *Id.* at 89–90. Peter Farago also indicated that he did not delegate to his own attorneys, including Wolf, the power to make binding agreements. Farago Dep. Tr. at 13.

The commencement and termination provision that Wolf proposed to Loye stated:

> This Agreement shall commence on June 1, 1999 and we shall continue to serve as your advertising agency until either party shall terminate by giving not less than sixty (60) days prior written notice. Notice of termination shall become effective upon receipt of such notice by the party to whom it is addressed. Our rights and duties shall continue in full force during the sixty (60) day notice period and, for the avoidance of doubt, we shall continue to receive our minimum monthly fee and commissions on any advertising produced or ordered before or during the sixty (60) day period.

Draft of Contract, dated as of June 1, 1999 ("Draft"), § IV(k), attached as Ex. D to Farago Aff.

Along with the proposed language for the termination clause, Wolf e-mailed to Loye the following message:

Further to our discussion earlier today, here is the language to be added to Section V(k) of the Farago / Hollinger Agency / Client agreement. . . . I would appreciate your inserting this language into your draft of the agreement and sending out signature copies of the revised agreement at your earliest convenience. Please let me know if this language will be acceptable.

Letter from Wolf to Loye, dated Oct. 13, 1999, attached as Ex. C to Farago Aff.

At this time, the parties apparently had not yet agreed on Farago Advertising's proper status as an agent of Hollinger. Loye Aff., ¶ 7. Wolf has stated that the parties had agreed to cement Farago's agency status in a separate and subsequent agreement. Wolf Dep. Tr. at 134–35.

Loye incorporated the termination provision into a master document, which already contained a merger clause stating that the agreement could not be altered except by a signed writing. Draft, § V(a).

Loye sent the document, unsigned, back to Wolf. Pl.'s Mem. of Law at 5; Farago Aff. ¶ 13. The revised draft concluded with the language: "Please indicate your acceptance of the terms and conditions by signing the enclosed copy of this letter and returning it to us." Draft, pp. 4. Every draft of the agreement had included this statement. Loye Aff. ¶ 5.

In these negotiations, while Farago Advertising initially had the clerical responsibility for amending the draft and sending the revised copy to the other party for approval, by this point Hollinger had as-

sumed that responsibility. *See* Letter from Loye to Nancy Todd at Farago Advertising, dated Sept. 28, 1999 (requesting that master copy of draft be transferred to Loye's office and maintained there), attached as Ex. I to Def.'s Notice,; Wolf Dep. Tr. at 70–71; Loye Aff. ¶ 10 (conceding that Loye took on the task of updating the draft).

The last line of the draft was originally written by Farago Advertising, when Farago Advertising maintained the master copy of the draft, and was directed toward Hollinger, dictating a mode of acceptance for Hollinger as the offeree. Wolf Dep. Tr. at 108–09 and 111–12. Peter Farago testified that as a result of the shift in clerical responsibilities, he believed the signature requirement as of that point applied to Farago Advertising rather than Hollinger. Farago Dep. Tr. at 69–70. Wolf conceded, however, that he never communicated this new understanding to Loye. Wolf Dep. Tr. at 108–09.

In addition to the revised draft itself, Loye included the following cover letter in the October 13 transmission:

Re: Farago Agreement

Enclosed are two (2) copies of the above referenced agreement. The language you requested to be added to Section V(k) has been inserted.

Please have your client execute both copies of the Agreement and return them to me in the enclosed pre-addressed, pre-paid Federal Express envelope. I will then have them signed and return one fully executed original to you for your files.

Loye's e-mail message to Wolf, dated Oct. 13, 1999, attached as Ex. D to Farago Aff.

Peter Farago personally signed the contract and returned it to Loye. Farago Aff. ¶ 20. Subsequently, on October 22, 1999, Loye wrote to Wolf: "Yes contract was

received and forwarded to our New York office for execution. I will forward draft permission letter format to you shortly." Pl.'s Ex. E, e-mail from Loye to Wolf, dated Oct. 22, 1999. Hollinger, however, never did sign the document. Healy Aff. ¶ 14.

Wolf attested that during the negotiations up to this point, Hollinger indicated that the signature requirement was a precondition of payment rather than a means of assent to the contract. *See* Wolf Dep. Tr. at 147–49 and 153–54. Peter Farago referred to Healy's "rigorous demands, apparently, from [Hollinger] to have something in writing or . . . whatever it was that [Healy] needed so that . . . he could write a check to us." Farago Dep. Tr. at 41. Wolf conceded that this construction of the signature requirement as a precondition of payment may not have been his initial understanding of the contract, however. Wolf Dep. Tr. at 153–54. Wolf conceded "[i]t was contemplated that both parties would sign" the contract. Wolf Dep. Tr. at 114–15.

In reference to a change from an early to a later draft requiring that Farago Advertising obtain written approval by Hollinger of all contractual agreements or incurring of debts on Hollinger's behalf, Wolf acknowledged that Hollinger had a general concern about "making sure that anything that you did on their behalf had their written approval." Wolf Dep. Tr. at 58–59. Wolf also stated that he could not think of a contract he had negotiated, aside from this one, where he had not received a "fully signed" agreement from the parties. *Id.* at 173–74.

Shortly after Loye's e-mail communication to Wolf on October 13, Hollinger paid Farago Advertising for all of its work dating back to June 1999. Pl.'s Mem at 2; Def.'s Local Rule 56.1 Statement, ¶ 14. In addition, Hollinger paid Farago Advertis-

ing a minimum monthly fee of $42,000 for each of the next two months, namely November and December. Pl.'s Mem at 2; Def.'s Local Rule 56.1 Statement, ¶ 14. The verbal agreement (Healy Aff. ¶ 17) and written document (Draft § III(1)) both required a minimum monthly payment of $42,000.

Hollinger did not ask Farago Advertising to do any additional work in November or December. Healy had "concluded that it made sense to put the campaign on hold until a decision was made with respect to [a] possible divestiture," and therefore "called Peter Farago and told him to stop all work on Hollinger's campaign." Healy Aff. ¶¶ 9–16.

However, Hollinger "had not yet made a decision to abandon the campaign," and still considered Farago Advertising to be on retainer, ready to recommence work, during those months. Healy Aff. ¶ 17.

On December 20, 1999, after deciding not to go ahead with the advertising campaign, Healy notified Peter Farago that Hollinger would not be executing the agreement. Letter from Healy to Peter Farago, dated Dec. 20, 1999, attached as Ex. F to Farago Aff. Hollinger agreed to pay for charges incurred through Dec. 31, 1999. *Id.* Hollinger paid no additional monies to Farago. Pl.'s Mem. at 7; Farago Aff. ¶¶ 24–26.

Farago has sued Hollinger for $84,000— based on an alleged minimum monthly payment for January and February—as well as interest, attorney's fees and costs. Pl.'s Mem. at 11. In this action, Farago asserts theories of breach of a written agreement; breach of an oral contract, and promissory estoppel. Pl.'s Mem. at 7. The parties have made cross motions for summary judgment.

## DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under New York law, to establish a breach of contract a plaintiff must plead and prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. *See First Investors Corp. v. Liberty Mut. Ins. Corp.,* 152 F.3d 162 (2d Cir.1998). Summary judgment is appropriate in a breach of contract action where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning. *See Fulton Cogeneration Assoc. v. Niagara Mohawk Power Corp.,* 84 F.3d 91, 98 (2d Cir.1996). Contract language is unambiguous when it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Ins. Co. of North America,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)).

### B. THE ALLEGED WRITTEN CONTRACT

#### 1. Standard for Formation of a Written Contract

█ Under New York law, " '[a]n offer is an act on the part of one person whereby he gives to another the legal power of creating the obligation called contract.' " *Alleghany Corp. v. James Found. of N.Y., Inc.,* 115 F.Supp. 282, 299 n. 29 (S.D.N.Y.1953) (quoting Arthur L. Corbin, *Offer and Acceptance and Some of the Resulting Legal Relations,* 26 Yale Law Journal (1917)), *aff'd* 214 F.2d 446 (2d Cir.1954), *cert. denied* 348 U.S. 913, 75 S.Ct. 293, 99 L.Ed. 716 (1955). An acceptance is the exercise of that power. *Id.* As long as " 'some further act' " by a supposed offeror is necessary in order for a contract to take effect, " 'there is as yet no offer.' " *Id.*

█ A offeror can "dictate the manner of an offeree's acceptance," for example by requiring that the acceptance be in writing. *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,* 58 F.Supp.2d 228, 249 (S.D.N.Y.1999). As a default rule, an informal, verbal agreement is enforceable even if the parties contemplate memorializing the agreement in writing. *See R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984) (citing *Mun. Consultants & Publishers, Inc. v. Town of Ramapo,* 47 N.Y.2d 144, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143, 1145 (1979); *V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir. 1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969)). However, "if either party communicates an intent not to be bound until he achieves a fully executed document," informal negotiations or verbal agreements will not constitute a binding contract. *Winston v. Mediafare Entm't Corp.,* 777 F.2d 78, 80 (2d Cir.1985).

█ Pursuant to New York law, the Court must balance four factors to determine whether a party communicated an intent to be bound only by a signed agreement: (a) whether the parties expressly reserved the right to be bound only be a signed writing; (b) whether either party has partially performed under the agreement; (c) whether the parties agreed on all the terms of the alleged contract, and (d) whether the type of contract involved is usually put in writing. *Evolution Online*

*Sys., Inc. v. Koninklijke Nederland N.V.,* 41 F.Supp.2d 447, 450 (S.D.N.Y.1999) (citing *Winston,* 777 F.2d at 80).

The first factor "is the most important," *Rappaport v. Buske,* No. 98 Civ. 5255, 2000 WL 1224828, at \*5 (S.D.N.Y. Aug. 29, 2000); *accord RKG Holdings, Inc. v. Simon,* No. 98–9433, 1999 WL 464979, at \*1 (2d Cir. June 23, 1999), and has in some cases found to be dispositive, *see, e.g., Chiriqui Land Co. v. M/V Snow Flower,* No. 90 Civ. 2729, 1991 WL 156345, at \*2 (S.D.N.Y. Aug. 6, 1991).

### 2. *The First Factor: Express Reservation*

■ Farago Advertising argues that the terms of the contract did not require formal execution by both parties. *See* Pl.'s Mem. at 2; Farago Aff. ¶ 17. Hollinger counters that it made clear that it did not wish to be bound in the absence of a signed writing. *See* Def.'s Local Rule 56.1 Statement, ¶ 6.

The language of the draft itself, as well as Loye's cover letter, leave no doubt that Hollinger intended to be bound only by a signed agreement. None of the communications between Wolf and Loye constituted an acceptance by Hollinger, or gave Farago the power to create a binding contract by signing the agreement.

The evidence leaves no question that the final line of the draft required Hollinger to sign the draft in order to forge a contract. As Wolf conceded, Farago Advertising initially played the role of the offeror in the negotiations, creating revised copies of the draft and sending them to Hollinger for approval. *See* Wolf. Aff. 109–10 and 111–12. Thus, the original meaning of the last line of the draft was that Hollinger had to "[sign] the enclosed copy of this letter," Loye Aff. ¶ 5, in order to create a contract.

There is no doubt that this language set down an exclusive mode of acceptance. In *Japan Cotton Trading Co. v. Farber,* 233 A.D. 354, 253 N.Y.S. 290 (N.Y.A.D. 1st Dept.1931), a draft of a contract stated: "Please sign this contract in duplicate ... and return one copy promptly." *Id.* at 292–93. The court concluded that this language did not mandate that the offeree sign the contract in order to assent. *Id.* at 293. But the language in *Japanese Cotton* said nothing about signing the contract being a necessary step to contract formation, while the language in the case at hand made it clear that signing was the means to accepting the contract. *See* Def.'s Reply Mem. at 3.

The language at issue here more closely resembles that involved in a Second Circuit case in which the court found that the parties did not express intent to be bound until they had executed a signed agreement. *See Ciaramella v. Reader's Digest Assoc.,* 131 F.3d 320 (2d Cir.1997). As in this case, the draft document in *Ciaramella* expressly requested a signature as the mode of assent: "This Settlement Agreement and General Release shall not become effective ('the Effective Date') until it is signed by Mr. Ciaramella, Davis & Eisenberg, and Reader's Digest." *Ciaramella,* 131 F.3d at 324.

Wolf argues that when the clerical responsibility of updating the contract shifted to Hollinger, Hollinger became the offeror, thus reversing the object of the instruction, "Please indicate your acceptance ..." Loye Aff. ¶ 5. As a result, Wolf argues, Farago Advertising now had the power to create a binding agreement by signing the document. *See* Wolf. Aff. at 74–76.

Farago Advertising's argument fails because Peter Farago never communicated his new understanding of this language to Hollinger. *See* Wolf Dep. Tr. at 108–09.

There is no dispute that the parties' original understanding was that the language required Hollinger to sign. As in *Ciaramella*, the parties had been bargaining for "weeks" over a draft that "at all times" contained this language. *Ciaramella*, 131 F.3d at 325. Farago Advertising may not entrap Hollinger by unilaterally redefining the meaning of that language. *See Durable v. Twin County Grocers*, 839 F.Supp. 257, 260 (S.D.N.Y.1993) ("Fear of entanglement in unintended commitments, and of failure of others to honor commitments, are equally inimical to the efficient conduct of business. . . . Where a writing sent by the party to be bound to the other specifically indicates that an additional agreed-upon writing is contemplated prior to entry into a binding contract, this indication of intent should be honored. Otherwise . . . the result would be that of trapping parties in surprise contractual obligations that they never intended.") (citations and internal quotation marks omitted); *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 497 (S.D.N.Y.1987). Thus, Wolf did not have the power to create a binding contract by signing the draft Loye sent to him.

In any case, Farago Advertising's argument is immaterial. If Hollinger's interpretation of events is correct, then Farago Advertising's October 13, 1999 e-mail message constituted an offer. Under the terms of that offer, Hollinger had to sign the contract in order for it to take effect. If Farago Advertising's interpretation is correct, then Farago Advertising's October 13, 1999 e-mail was a request for an offer, since a positive response from Hollinger would not have resulted in a contract without the further act of a signing by Farago Advertising. Either way, Loye's October 13, 1999 response did not form a contract. The communication was unsigned, and thus did not create a contract under Hollinger's interpretation of the last line of the draft. And if Farago Advertising's view is correct, Loye's cover letter nevertheless imposed the additional requirement that both parties sign the draft in order to create a contract. As Loye was in the position of making a counter-proposal, Loye had the power to "dictate the manner" of acceptance. *See Granite Partners*, 58 F.Supp.2d at 249. Loye's cover letter specified that both parties had to sign the agreement, and that the agreement would not be "fully executed" until Hollinger had signed. Loye's e-mail message to Wolf, dated Oct. 13, 1999, attached as Ex. D to Farago Aff.

Because Loye's reply required both parties to sign the agreement, but was unsigned by Hollinger, the communication constituted a request for an offer. Farago Advertising's subsequent transmission of a signed copy of the agreement to Hollinger was an offer, giving Hollinger the power to create a contract by signing. Since Hollinger never accepted that offer in the manner it had prescribed, the parties never created a contract.

While Wolf suggests that the signature requirement actually was a precondition of payment rather than a means of acceptance, *see* Wolf Dep. Tr. at 147–49 and 153–54, this understanding has no support in the language of the documents themselves, which as explained above clearly stated that signing was a means of acceptance. In addition, saying that "we cannot [make payment] until we have a signed agreement," *see* Wolf Dep. Tr. at 147, is fully consistent with the concept that both parties had to sign the document for it to become a contract. *See Scheck v. Francis*, 26 N.Y.2d 466, 469, 260 N.E.2d 493, 494, 311 N.Y.S.2d 841, 843 (1970)("It is well settled that, if the parties to an agreement do not intend it to be binding upon them until it has been reduced to writing and signed by both of them, they are not bound

and may not be held liable until it has been written out and signed.").

Peter Farago's description of what Healy "needed" also does not support Wolf's theory, since Peter Farago seems to concede that Healy may have needed something other than the signed writing. *See* Farago Dep. Tr. 40–41. Furthermore, subsequent questioning of Wolf exposed his theory to be nothing more than a convenient re-interpretation of the original agreement. *See* Wolf Dep. Tr. at 153–54 and 114–15.

In a more general sense, the parties seemed to understand that all aspects of their business relationship, including the formation of binding, long-term contracts, were to be executed in written form. Although the language of the draft agreement and cover letter, discussed above, by themselves eliminate all question of material fact, this general tenor of the relationship serves to further cement Hollinger's case.

First, a merger clause, such as the one included in the draft agreement, suggests "that the parties did not intend to be bound prior to the execution of a written agreement." *Ciaramella,* 131 F.3d at 324; *accord Abah v. N.Y.C. Dep't of Trans.,* No. 96 Civ. 6192, 1998 WL 61006, at *3–4 (S.D.N.Y. Feb. 13, 1998) (while the court's decision meant the merger clause was merely in a draft, "the draft is at least probative of the intention of the defendants to insist on a written agreement as a precondition for a binding contract").

Wolf counters that the sole reason for the merger clause was that the parties were concerned that company employees might carelessly assent to verbal agreements "on the fly," once the parties started dealing with one another on a regular basis. Wolf Dep. Tr. at 105–07. Since the contract itself was to be the product of "months of negotiation," the formality of a signature, Wolf contends, was not required in order to avoid reckless contracting. *Id.*

However, the actual nature of Hollinger's negotiating style undercuts Wolf's argument. Hollinger's executives delegated a great deal of negotiating responsibility to Loye, yet wanted to retain the power to give final approval to any deals. An effective way to accomplish that would have been to provide that the contract would not take effect until signed by a Hollinger executive.

In addition to the significance of the merger clause, Wolf conceded that he recognized Hollinger's general concern about putting binding agreements into writing. *See* Wolf Dep. Tr. at 58–59.

Thus, the last line of the agreement and Loye's cover letter were perfectly clear in requiring Hollinger's signature. Even if this language required clarification, the merger clause and the parties' general understanding of each other's negotiating style would confirm that a signature was required. No material issue of fact exists as to the first factor, "whether there has been an express reservation of the right not to be bound in the absence of a writing," *Evolution Online,* 41 F.Supp.2d at 450.

As the language of the contract contains no ambiguity, this Court "need not look beyond the first of the factors listed in *Winston*". *Chiriqui Land,* 1991 WL 156345 at *2. An examination of the other three factors, however, only bolsters Hollinger's case.

3. *The Second Factor: Partial Performance*

■ Hollinger did not partially perform under what Farago Advertising has claimed is a binding, written agreement.

Farago Advertising argues that the verbal agreement from June would not have required Hollinger to pay Farago Advertising in November and December. *See* Pl.'s Mem. at 5, n. 4. Since Farago was not doing work during that time, and the agreement was on a month-to-month basis, Hollinger could simply have canceled the agreement. *Id.*

This argument is insufficient to create a triable issue of material fact. The uncontroverted evidence shows that Hollinger considered Farago Advertising to be on retainer in November and December, meaning that Farago Advertising was incurring costs and that payment was appropriate. *See* Healy Aff. ¶¶ 9–16, 17. Farago Advertising has not presented any evidence to the contrary. As the court noted in *Durable*, "Parties can and do conduct business relationships without binding overall contracts, or during discussion of whether or not to enter into a more binding or longer-lasting relationship. If this is kept in mind, various subsequent events are as consistent with continuing negotiations, the hope of agreement, or the possibility that some business might be done without a binding umbrella relationship, as with entry into a large-scale long-term contract ..." 839 F.Supp. at 261.

Based on the evidence at hand, no question exists that Hollinger's payments were made pursuant to a verbal contract.

### 4. *The Third Factor: Agreement on Terms of the Contract*

The parties had no stated points of disagreement as far any "material terms of the contract," even "minor or technical." *See Ciaramella,* 131 F.3d at 325. Of course, that Hollinger did not sign the document suggests that there may have been some tacit areas of difference. As noted above, while the parties had yet to agree on Farago Advertising's status as an agent (*see* Loye Aff. ¶ 7), the parties agreed to clarify that point in a separate agreement (*see* Wolf Dep. Tr. at 134–35).

### 5. *The Fourth Factor: Type of Agreement Usually Reduced to Writing*

■ In order to determine whether an agreement is of a type that usually is reduced to a signed writing, the Court must consider "whether the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception." *R.G. Group,* 751 F.2d at 76.

Farago Advertising's counsel testified that in his experience, this type of agreement usually is signed by both sides. *See* Wolf Dep. Tr. at 173–74. Without any evidence to the contrary, this Court must conclude that this type of agreement normally takes the form of a signed writing.

### 6. *Even If Signature Was Not Required, Loye's October 13, 1999 E–Mail Was Not Sufficient to Create a Contract*

■ Even if Farago Advertising is correct, and the contract did not require a signature, the parties still did not execute the written agreement, as an authorized representative of Hollinger never assented in any form. Farago Advertising has failed to produce evidence that Loye was a true agent of Hollinger. Therefore, Loye's October 13 e-mail responding positively to the proposed termination clause did not bind Hollinger. No authorized Hollinger executive approved the final draft of the contract.

■ Under New York law, an individual has agency status—and thus the power to bind a principal in a contract—if he has actual or apparent authority. *See*

*King World Prod., Inc. v. Fin. News Network,* Inc., 660 F.Supp. 1381, 1383 (S.D.N.Y.1987), *aff'd* 834 F.2d 267 (2d Cir. 1987). Actual authority may be either express or implied. *King World,* 660 F.Supp. at 1383. Implied authority is "a kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers" (*id.* (citation omitted)), and where the agent acts "in the manner in which business entrusted to him is usually done" (*id.* at 1384 (citation omitted)).

As noted above, Hollinger denied that he expressly designated Loye as an agent, or that he asked her to function in that capacity on other occasions. *See* Healy Aff. ¶ 7. Farago Advertising has presented no evidence to the contrary, and thus has failed to establish a material issue of fact as to whether Loye had express or implied authority.

> As defined by a case in this Court,
>
> apparent authority is the application of the doctrine of estoppel. It arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess. If a third person holds the reasonable belief that the agent was acting within the scope of his authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized .... So long as a principal's words and conduct make it reasonable to believe that an agent has authority to enter into a transaction, a third party relying on that reasonable belief need not inquire further into actual authority, and the principal will be bound by its agent.
>
> *King World,* 660 F.Supp. at 1385.

In this case, Loye's behavior could not have engendered a reasonable belief that Loye was authorized to bind Hollinger in a contract. Loye's statement that she never represented herself as an agent of Hollinger finds support in her October 22, 1999 e-mail, in which she indicates that the "New York office" had the power to execute the contract. *See* E-mail from Loye to Wolf, dated Oct 22, 1999, attached as Ex. E to Farago Aff.

Wolf himself admitted at least the possibility that Loye made her position clear. *See* Wolf Aff. at 94. At another juncture, Wolf conceded that he did not know what Loye's status was, which directly undercuts the requirement of a "reasonable belief." *King World,* 660 F.Supp. at 1385. Peter Farago stated that he did not delegate agency power to his own attorneys, *see* Farago Dep. Tr. at 13; neither Farago nor Wolf has explained why he would assume that Hollinger had done so.

If Wolf or Peter Farago truly believed that Loye had the power to bind Hollinger in a contract, that belief was not based on Loye's actual behavior. There is no question that even if Loye approved of the contract, her assent was not sufficient to create an agreement enforceable against Hollinger.

## C. *THE ALLEGED VERBAL CONTRACT*

### 1. *The Verbal Agreement from June 1999*

The verbal agreement between Hollinger and Farago Advertising from the month of June 1999, while valid and enforceable under New York State's two statute of frauds provisions, N.Y. Gen. Oblig. § 5–701 (2000) and N.Y.U.C.C. § 2–201 (2001) (*see Pickering v. Am. Express Travel Related Services Co., Inc.,* No. 98 CIV 8898, 2001 WL 753782, at *4 (S.D.N.Y. July 3, 2001)), did not include a provision requiring notice of termination. The only term of the agreement, as both parties concede, was a monthly payment in

return for work performed. *See* Healy Aff. ¶ 3; Farago Dep. Tr. at 28–29. Farago Advertising has provided no evidence, aside from Peter Farago's own affidavit submitted in opposition (*see* Farago Aff. ¶ 9), of a customary 90–day notice of termination clause, while Hollinger has not admitted to the existence of such a custom (*see* Answer ¶¶ 14–15). Given this lack of evidence, and the fact that Peter Farago's own description of the verbal agreement specifically conceded that month-by-month payment was the only term (*see* Farago Dep. Tr. 28–29), Farago Advertising has failed to establish a material issue of fact that the termination clause was an implied term.

### 2. *Subsequent Verbal Discussions Did Not Bind the Parties to a Termination Clause*

Subsequent verbal discussions between the parties did not bind the parties to a termination clause, or modify the agreement in any other way. Farago Advertising's sole evidence of this modification of the verbal agreement is a statement by Healy that Farago Advertising interprets as an admission of that modification. *See* Pl. Reply Mem. at 1. Even a cursory look at that statement indicates that Healy does not admit that he agreed to the termination clause; in fact, he explicitly states that he did not do so. *See* Healy Aff. ¶ 13. Based on the evidence available, a jury would have no reasonable basis to conclude that Hollinger agreed to this provision.

### D. *THE PROMISSORY ESTOPPEL ARGUMENT*

■ "The elements of promissory estoppel are: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Ripple's of Clearview, Inc. v. Le Havre Assoc.*, 88 A.D.2d 120, 452 N.Y.S.2d 447, 449 (N.Y.A.D. 2 Dept.1982), *appeal denied* 57 N.Y.2d 609, 456 N.Y.S.2d 1026, 442 N.E.2d 1277.

■ Farago Advertising has not pointed to any "clear and unambiguous" promise (*see Ripple's*, 452 N.Y.S.2d at 449), made by a Hollinger representative regarding a termination clause. Of course, Farago Advertising has argued that the written draft included an enforceable notice of termination provision. Since Hollinger did not assent to that agreement, however, it did not constitute a promise at all.

### CONCLUSION AND ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Court's Decision and Order dated July 31, 2001 is hereby amended to incorporate the foregoing discussion; and it is further

**ORDERED** that Plaintiff Farago Advertising, Inc.'s motion for summary judgment [9–1] is denied; and it is further

**ORDERED** that Defendant Hollinger International, Inc.'s cross-motion for summary judgment [13–1] is granted.

**SO ORDERED.**